750 So.2d 867 (1999)
STATE of Louisiana
v.
Bobby L. HAMPTON.
No. 98-KA-0331.
Supreme Court of Louisiana.
April 23, 1999.
Dissenting Opinion June 15, 1999.
*872 Sarah Lynn Ottinger, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Paul Carmouche, District Attorney, Hugo A. Holland, Jr., Catherine Estopinal, Shreveport, Counsel for Respondent.
Dissenting Opinion of Judge Johnson, June 15, 1999.
TRAYLOR, Justice.[*]
On September 28, 1995, a Caddo Parish Grand Jury indicted the Defendant, Bobby Hampton, for the first degree murder of Philip Russell Coleman in violation of La. Rev.Stat. 14:30. After a trial by jury, the Defendant was found guilty as charged. At the conclusion of the penalty phase the jury, having found one aggravating factor, unanimously sentenced the Defendant to death. The trial judge sentenced Defendant to death in accordance with the jury determination. This matter is now before this court on direct appeal. La. Const. art. V, § 5(D). On appeal, Defendant alleges eighty-two assignments of error for the reversal of his conviction and sentence.[1]

FACTS
At approximately 12:55 a.m. on August 12, 1995, the Defendant, Bobby Lee Hampton, and his co-defendants, Elbert Williams and Michael Williams, entered the Thrifty Liquor Store on the corner of Greenwood and Monkhouse Roads in Shreveport, Louisiana, as the employees were preparing to close for the evening. The cashier, Colette Shinberger, rang up a *873 customer's purchases while a second employee, Frank Tesnear, walked to the rear storeroom to get some trash bags. The third employee, Philip Russell Coleman, sat on the turnstile waiting to lock the entrance doors. After all legitimate customers exited the store, the Defendant approached the sales counter with a soft drink and some potato chips but said he forgot something and left the sales counter.[2] Co-defendant Michael Williams remained near sales counter, and co-defendant Elbert Williams stood between the sales counter and the entrance. Without warning, multiple shots were fired and the employees were informed that there was a robbery in progress. After this point, Tesnear and Shinberger could no longer see Coleman at the entrance turnstile. When the robbers exited the store, they found that Coleman had been shot and killed during the commission of the robbery.
Police Detective Muller interviewed Tesnear immediately after the incident. Tesnear requested a second interview nine days later because he was concerned that he had not told the police all that he had seen on the day of the shooting.[3] Tesnear recounted that he walked down the aisle leading to the rear storeroom and reached the storeroom door before he heard several gunshots. He immediately turned and saw the Defendant standing directly behind where Coleman had been sitting on the entrance turnstile. He also saw Elbert and Michael Williams near Shinberger at the sales counter. Elbert Williams was standing closest to the turnstile where Coleman had been seated and Michael Williams was on the other side of the sales counter, near the store exit. Initially, Tesnear told the detective that he believed Elbert Williams was the shooter because he was standing closest to the victim. However, during the second interview Tesnear considered the location of the victim, the bullet holes in the entryway door, and the relative location of all three suspects and realized that the shots had to come from behind the victim: where Defendant was standing at the time of the gunfire.
As Elbert and Michael Williams took money out of the cash registers in the front of the store, the Defendant, walked toward Tesnear in the back of the store, pointed a gun at him, and ordered him to lay on the floor. Later, the Defendant forced Tesnear to break into and ransack the manager's office. According to Tesnear, as the Defendant left the store, he told Elbert and Michael Williams to "[t]ake care of the other two." However, the co-defendants followed the Defendant out of the store and did not involve themselves further with the store employees.
After checking Russell Coleman for a pulse, Tesnear asked Shinberger to call the police. She responded that the phone inside the store had been ripped out of the wall. Tesnear exited the store to use the pay phone to call 911. As he was making the call, the police arrived. The police determined that Coleman, who had been shot three times in the back, was dead.
Shinberger was also interviewed two separate times and related her version of the events to the police. While her statements were not entered into evidence at trial, the State provided the transcript of these interviews to the defense in its responses to discovery. The substance of her statement was that the Defendant left the sales counter seconds before she heard the gunshots. She saw only two of the suspects, the Defendant and a "younger suspect," because she was ordered to lay on the floor under the sales counter shortly after the gunfire. She stated several times that she did not see who shot Coleman[4] and did not see any of the suspects *874 with their guns aimed at Coleman. Nevertheless, she believed Elbert Williams was the shooter.
On August 13, 1995, the police received an anonymous tip identifying Bobby Hampton, Elbert Williams, and Michael Williams as the perpetrators of the Thrifty Liquor homicide and armed robbery. The police confirmed the information received in the tip. The surviving employees were subsequently shown photographic and video line-ups of the suspects. Tesnear identified the Defendant, Elbert Williams, and Michael Williams. Shinberger only tentatively identified the Defendant in the photographic line-up and only positively identified Elbert Williams. The Defendant was arrested for first degree murder on August 14, 1995. He denied any involvement in the crime and claimed that he had been with his girlfriend, Marla Manning, at the time the crime was committed. Manning initially served as an alibi for the Defendant but she retracted when the police confronted her with conflicting information.
On September 26, 1995, the grand jury conducted a hearing wherein Shinberger and Tesnear testified as eyewitnesses to the August 12, 1995 armed robbery and murder. Testimony from all witnesses was released to the defense as Brady material. The defense used Tesnear's grand jury testimony in an attempt to impeach him at trial due to prior inconsistent statements he made identifying Elbert Williams as the shooter. On September 28, 1995, the grand jury indicted Bobby Hampton for first degree murder. The case went to trial on May 19, 1997. At trial, the Defendant's strategy was to concede participation in the armed robbery but argue that he was not the shooter. The State called fourteen witnesses to prove its case against the Defendant. The testimony pertinent to our inquiry may be summarized as follows:
Franklin Tesnear, a victim of the armed robbery testified consistent with all previous statements that he was walking to the rear storeroom when he heard three or four gunshots. He turned and saw the Defendant pointing a gun in the direction of Coleman. The Defendant then walked toward Tesnear, flattened him to the ground, and later forced him to break into the locked manager's office. The State asked Tesnear for an explanation as to why this testimony differed from his previous statement to police and grand jury testimony identifying Elbert Williams as the shooter. He responded that he thought about where the bullets hit the glass front door and realized that Elbert Williams could not be the shooter because his position was wrong and that the Defendant was the only perpetrator who was "in line" with the bullet holes in the door.
Next, Corporal Rick D. Hall, an expert crime scene reconstructionist for the Shreveport Police Department testified that he responded to Thrifty Liquor shortly after the crime and saw a blood-soaked rug, glasses, three shell casings, and bullet holes in the front door. From his examination of the evidence at the crime scene, Corporal Hall deduced that three .38 caliber shots were fired in the store. Of specific importance, Corporal Hall revealed that the shell casings were scattered to the north of the turnstile which indicated to him that the shooter was at the end of the first counter and, based on the amount of gun powder on Coleman, the shooter stood ten to twelve feet from Coleman at the time of the shooting. He opined that the shooter could not have been at the sales counter where Tesnear had located Elbert and Michael Williams.
*875 Richard Beighley, a criminalist at North Louisiana Crime Lab, examined Coleman's shirt after the murder and testified that the shooter stood between eighteen inches and six feet from the victim. However, he stated that a distance determination under the circumstances of this case was complicated because more than one bullet had been shot.
Corporal Jimmy Muller of the Shreveport Police Homicide Unit testified regarding the homicide investigation he conducted subsequent to the murder. In his recollection, Tesnear originally believed Elbert Williams was the shooter. However, when the officer inquired about the relative location of all perpetrators during the shooting, Tesnear visualized the events and concluded that he had been mistaken. He realized that the Defendant was the shooter due to his location in the store and the trajectory of the bullets. Muller emphatically stated that Tesnear never changed his placement of the suspects during the gunfire.
Dr. George M. McCormick, III, a coroner and expert in forensic pathology, performed the autopsy on Coleman. Dr. McCormick testified that Coleman died due to three gun shots to the torso which lacerated and tore his heart, lungs, liver, pancreas, and right kidney. He opined that death resulted from a lack of blood to the brain due to extensive hemorrhaging in the chest and abdomen. The nature of the bullet wounds indicated to him that Coleman either did not move throughout the shooting or that the three shots were in rapid sequence. Based on the other forensic evidence, the doctor opined that the shooter was located behind and slightly to the south of the victim. He excluded any possibility that the shooter stood near the sales counter.
The final witness was Sergeant Mark Rogers, an expert in crime scene analysis employed by the Shreveport Police Department. He testified that the distance from the muzzle of the gun to Coleman was between two to ten feet, with the more likely range being three to six feet. He agreed that the distance determination was complicated because more than one shot was fired at the victim. Based on the evidence, he determined that the victim either did not move during the shooting or that the shots were fired in rapid succession. There was some evidence that Coleman turned his body or was falling during the shooting due to the disparity between the entry and exit wounds. He believed all shots were fired from the same basic point of origin, which was to the south-east of where the victim was sitting. Sergeant Rogers drew a fan on the store floor plan which indicated the area where the shooter was located at the time of the shooting.
During a break in testimony on the last day of trial Mr. Golden, counsel for the defense, requested a continuance, properly termed a mid-trial recess, so that he could locate Shinberger because she had not appeared as subpoenaed. The judge denied the request for a recess but allowed the Defendant to attempt to contact Shinberger.[5] The Defendant did not object to *876 the court's ruling. Defense counsel was not able to contact Shinberger,[6] called no witnesses, and rested its case at the summation of the State's case.
Throughout the trial, the defense conceded that the Defendant was one of the three men who committed the armed robbery of the Thrifty Liquor Store and that "at times" the Defendant was the ringleader of the group. However, the defense maintained that the Defendant was not the triggerman and, thus, proposed that the jury impose a more lenient penalty and sentence.
At the conclusion of the guilt phase on May 27, 1997, the jury, having considered all evidence and testimony on the record, found the Defendant guilty as charged of first degree murder. After the penalty phase, the jury unanimously sentenced the Defendant to the death penalty. The Defendant filed a motion for new trial and *877 motion for post verdict modification of judgment which were argued and denied on August 18, 1997. On September 2, 1997, the Defendant was formally sentenced to death by lethal injection, in accordance with La.Rev.Stat. 15:569. He now appeals his conviction and sentence relying on eighty-two assignments of error.

DISCUSSION

GUILT PHASE ISSUES

Ineffective Assistance of Counsel
In Assignments of Error Nineteen through Twenty-one, the Defendant contends he received ineffective assistance of counsel because his trial counsel, Mr. Golden, failed to subpoena Thrifty Liquor cashier Shinberger to testify at trial and failed to obtain a recess to secure her presence. He claims that Shinberger's testimony would have resulted in a conviction for second degree murder rather than first degree murder. The Defendant now urges this court to find trial counsel's alleged negligence caused the jury to not hear exculpatory testimony from this witness.
A defendant's right to counsel is guaranteed by the federal and Louisiana constitutions. U.S. Const. Amend. VI; La. Const. art. I, § 13. As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted. State v. Hamilton, 92-2639 (La.1997); 699 So.2d 29, 31; State v. Sullivan, 596 So.2d 177 (La.1992), reversed on other grounds, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State ex rel. Bailey v. City of W. Monroe, 418 So.2d 570 (La.1982); State v. Prestridge, 399 So.2d 564 (La.1981).
In the present case, the record does not contain sufficient evidence to resolve Defendant's ineffective assistance of counsel claim on direct review. Defendant may re-raise this issue by application for post conviction relief in the trial court if he so chooses.
In a related argument, Assignment of Error Twenty-Two, the Defendant contends that the trial court erred by denying his motion for a recess, in reality a mid-trial recess, to locate Shinberger. As a general matter, the decision whether to grant or deny a recess rests within the sound discretion of the trial judge, and a reviewing court will not disturb the ruling absent a clear abuse of discretion. La. Code Crim. Proc. art. 712; State v. Gordy, 380 So.2d 1347, 1353 (La.1980).[7] Defendant cannot show that the trial court erred. As previously mentioned, motion for a recess based on the absence of a missing witness must meet the criteria set forth in La.Code Crim. Proc. art. 709; State v. Rogers, 553 So.2d 453 (La.1989); State v. Jackson, 450 So.2d 621 (La.1984). For this reason, this assignment of error is without merit.

Prosecutorial Misconduct
In Assignments of Error Twenty-Three and Twenty-Four, the Defendant contends that the prosecutor engaged in repeated misconduct which violated his constitutional rights and mandates reversal. He first argues that the prosecutor misstated the law regarding principals during closing argument when he stated, "Well, the judge is going to tell you that a person can be convicted of an offense even if he has not directly committed the offense act constituting the crime if he is found to be a principal." The Defendant argues that this statement is not true for a specific intent crime; however, the Defendant did not object, and therefore, this claimed error was not preserved for appeal. State v. Williams, 96-1023 (La.1/21/98); 708 So.2d 703, 709; State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375. In any event, the judge properly charged the jury as to the law of principals *878 before deliberations, thus correcting any prosecutorial error. State v. Cavazos, 610 So.2d 127, 129 (La.1992) ("prosecutor's misstatements of law during ... closing remarks, do not require reversal of Defendant's conviction if the court properly charges the jury at the close of the case.").
The Defendant also argues that he was prejudiced when the prosecutor argued facts in his opening statement, which were never established by the evidence, namely, that liquor was stolen during the robbery and that later that night the Defendant handed a bottle of gin to some women.[8] The scope of the State's opening argument is prescribed in La.Code Crim. Proc. art. 766, which provides that it "shall explain the nature of the charge, and set forth, in general terms, nature of the evidence by which the State expects to prove the charge." The Defendant claims that there was no evidence presented that the liquor was stolen from Thrifty. Detective Muller, the senior investigator on the case, testified that during a search of the Defendant's house several liquor bottles were recovered which were subsequently identified as the type sold by Thrifty. Although this does not conclusively prove that it was liquor stolen from Thrifty, the evidence does support the State's argument. However, even if these comments did exceed the proper scope of acceptable opening argument, the Defendant has not "thoroughly [and] convinc[ingly]" shown that the remark influenced the jury and contributed to the verdict, in view of the uncontested evidence that the perpetrators rifled the registers at Thrifty Liquor and made off with approximately $12,000. See State v. Taylor, 669 So.2d at 375. This argument lacks merit.
The Defendant next argues that he was prejudiced when the prosecutor impermissibly referred to the Defendant's failure to testify and also suggested that the defense could have called witnesses.[9] During his closing argument the prosecutor stated:
What was the uncontradicted evidence concerning the location of people inside this Thrifty Liquor? Uncontradicted. Where were people? There is only one person who testified where everybody was and nobody said anything different, although there were several that could.
The defense objected and argued that the statement was an indirect reference to the Defendant's failure to take the stand, and the court overruled the objection.
La.Code Crim. Proc. art. 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers to [t]he failure of the defendant to testify in his own defense." When no direct reference to the defendant's failure to testify has been made, a reviewing court should inquire into the "intended effect on the jury" to distinguish indirect references to the defendant's failure to testify, which are impermissible, from general statements that the prosecutor's case is unrebutted, which are permissible. State v. Johnson, 541 So.2d 818 (La.1989); see also State v. Fullilove, 389 So.2d 1282 (La.1980); State v. Jackson, 454 So.2d 116 (La.1984).
The prosecutor's statement appears to have been a comment on the fact that the State's evidence that the Defendant was the only one in the position to be the shooter was unrebutted. The defense conceded that, technically, the co-defendants or Shinberger were potential witnesses who could contradict the State's case, but argued that, in reality, because the co-defendants had pending first degree murder trials and because Shinberger was out of the state, the Defendant was the only witness available to contradict the State's case. However, Shinberger, Elbert Williams, and Michael Williams were all possible witnesses who could testify as to the location of the robbers. Furthermore, as the trial court correctly noted, although *879 various factors prevented these witnesses from testifying, the jury was not aware why they were not called, and therefore, would likely view the prosecutor's statement as a reference to their failure to testify, rather than the Defendant's failure to take the stand. Consequently, this argument lacks merit.
In his final argument regarding prosecutorial misconduct during the guilt phase, the Defendant contends that during closing arguments the prosecutor suggested that he could have presented additional evidence in support of the State's case. This court has held, "it is impermissible for a prosecutor to indicate to the jury that he has additional evidence of the Defendant's guilt which he did not present at trial." State v. Harrison, 367 So.2d 1 (La. 1979).
During his closing argument the defense attorney stated:
What's another issue here? The location. Mr. Holland says the location of everybody is uncontradicted. Is it? Well, no other witness testified. He could have called Colette Shinberger. She was an eyewitness. Where is she? They chose not to. I think you would have seen more contradictions.
During his rebuttal argument the prosecutor stated:
Mr. Golden said the State could have called Colette. Sure, we could have. We could have called all the people that were at the house where Bobby went when they split up the money. We could have called all the people concerning all the car evidence. We could have done that. Guess who else could have done that? Bobby Hampton.
As an initial matter, the defense did not object that this statement was improper because the prosecutor was referring to additional evidence which he could have produced, and thus, the claimed error has not been preserved for appeal. State v. Williams, 96-1023 (La.1/21/98); 708 So.2d 703; State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364. In any event, the prosecutor was simply responding to the defense's closing argument. The prosecutor was addressing this argument, by pointing out that jurors would draw the same negative inference from the defense's failure to present the witnesses. Moreover, even if the remarks were improper, if this court is not "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict" then the remarks do not require reversal. State v. Taylor, 669 So.2d at 375 (quoting, State v. Bates, 495 So.2d 1262, 1273 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987)). Given the evidence presented at trial supporting the Defendant's guilt, the Defendant cannot show that this brief comment influenced the jury and improperly contributed to the verdict. This argument lacks merit.

Other Assignments of Error
In Assignment of Error Twenty-Six, the Defendant argues that the trial court erred by denying his Motion for New Trial and by denying his Motion for Post Verdict Judgment of Modification of Verdict. The Defendant asserted in his motions that the evidence does not support a finding that the Defendant had the specific intent to kill the victim. He argues that the State did not produce any witnesses who saw who shot the victim, and Frank Tesnear's credibility was called into question by his numerous statements that Elbert Williams shot the victim. In addition, the Defendant argued that State Crime Lab determined that the gun seized from the Defendant's house was not the murder weapon, and that the Defendant never committed murder, or ordered, or procured anyone to commit murder.
A motion for new trial presents only the issue of the weight of the evidence, see Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (setting aside a verdict as against the weight of the evidence, as opposed to the insufficiency of the evidence under the Due Process Clause, does not bar retrial), and is examined under the so-called thirteenth juror standard, under which the judge reweighs the evidence. Id.; State v. Voorhies, *880 590 So.2d 776, 777 (La.App. 3rd Cir. 1991). The question of the sufficiency is properly raised by a motion for post-verdict judgment of acquittal. La.Code Crim. Proc. art. 821; State v. Demery, 28,396 (La.App.2d Cir.8/21/96); 679 So.2d 518, 522. But see La.Code Crim. Proc. art. 851 cmt. d ("[i]t is the duty of the trial judge to pass upon the sufficiency of the evidence" once ground (1) is raised under art. 851).
We treat the constitutional issue of sufficiency because the denial of a motion for new trial based upon La.Code Crim. Proc. art. 851(1) is not subject to review on appeal. State v. Bartley, 329 So.2d 431, 433 (La.1976). In reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Rosiere, 488 So.2d 965 (La.1986). First degree murder is the killing of someone when the perpetrator has the specific intent to kill and is engaged in the perpetration of an enumerated felony; including armed robbery, first degree robbery, or simple robbery. A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. See La. Rev Stat. 14:24. However, the Defendant's mere presence at the scene is not enough to "concern" an individual in the crime. State v. Schwander, 345 So.2d 1173, 1174-1175 (La.1977). A principal may be connected only to those crimes for which he has the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980); State v. McAllister, 366 So.2d 1340 (La.1978).
At trial, the Defendant did not argue that he was not involved in the armed robbery, but simply asserted that he was not the shooter, and that he did not have the specific intent to kill the victim. The State first called Frank Tesnear to give his account of the events he witnessed during the robbery. Tesnear testified that after he heard the gunshots he turned around and saw the Defendant pointing his gun toward the victim. In addition, Tesnear testified that as the Defendant left the store he told his accomplices, "Take care of the other two." Tesnear explained that he believed that the Defendant meant that Michael and Elbert Williams should kill them. He also explained that he initially told police that he thought the "skinny one" was the shooter, but after thinking about where the perpetrators were located in the store he said that he realized that the Defendant was the only one who could have been the shooter. On cross-examination the defense elicited that in both of his statements to the police, as well as in his grand jury testimony Tesnear indicated that the tall, skinny man was the shooter. The defense further attempted to impeach Tesnear with his statement from the second police interview in which he stated that at the time the gunshots were fired "the short fat one was pointing the gun at me."
In addition to numerous other police officers involved in the investigation, the State called Sergeant Mark Rogers, an expert in the area of crime scene analysis. Sergeant Rogers testified that the shooter was from two to ten feet from the victim, and the bullet was traveling slightly left to right when it hit the victim. Based on his findings Sergeant Rogers testified that the shot was fired from the area in the store where Tesnear testified the Defendant was located. Sergeant Rogers further testified that there was no way that a person located either near the counter, where Elbert Williams was standing, or near the other end of the counter near the exit, where Michael Williams was located, could have fired the shots. All of the State's experts agreed that the shooter in the general *881 location where Tesnear placed the Defendant at the time of the shooting. The defense did not call any witnesses to testify at the guilt phase of trial.
Given the State's uncontradicted evidence, the jurors, who were aware of the inconsistencies in Tesnear's recollection of events and were aware that the murder weapon was not recovered, could rationally have found that the Defendant was guilty of first degree murder. Tesnear's testimony, bolstered by the expert testimony of Sergeant Rogers provided ample evidence that the Defendant was the shooter.[10] Consequently, the Defendant cannot show that the trial court erred by denying his motion for new trial, or by declining to modify the verdict. These assignments lack merit.
The Defendant argues in Assignments of Error Twenty-Nine through Thirty-Three that the trial court erred by failing to timely inspect the grand jury testimony for exculpatory evidence. The Defendant contends that the trial court erred by failing to conduct an in-camera review of Frank Tesnear's grand jury testimony until after he testified at trial, just before cross-examination. According to the Defendant, because the defense received the material so late it did not discover the most crucial statement in the testimony.[11] In addition, the Defendant argues that the trial court erred by failing to conduct an in-camera review of Shinberger's testimony.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. 1194. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Willie, 410 So.2d 1019, 1030 (La.1982). The late disclosure as well as complete suppression of exculpatory evidence may also deny the defendant a fair trial. State v. Landry, 388 So.2d 699, 702 (La.1980); State v. Roussel, 381 So.2d 796 (La.1980); State v. Manning, 380 So.2d 46, 53-54 (La.1980).
At the hearing on the motion for Brady evidence the judge said that he would conduct an in-camera review of the grand jury testimony for Brady evidence, but said, "I don't go over it until I hear the witnesses." The defense did not raise an objection to that method. Subsequently, at trial after Tesnear testified on direct, the judge indicated that he thought that the defense was entitled to the transcript of Tesnear's grand jury testimony. Because it was the first time the defense had seen the testimony the judge said that he would give defense counsel thirty minutes to review it, and the defense attorney responded, "That will be sufficient." More importantly, on cross-examination, the defense attorney used the grand jury testimony in an attempt to impeach Tesnear as to his identification of the Defendant as *882 the shooter. Although appellate counsel contends that trial counsel missed the most important part of the testimony because of the late disclosure, the record indicates that the defense attorney confronted Tesnear with the following:
Q: Did you testify at a Grand Jury?
A: Yes, I did.
* * *
Q: Okay. And did you in response to the following question give the following answer.
Question: So the person, the tall skinny one that you saw over with Colette, do you believe him to be the one excuse me. Do you know him to be the shooter.
Answer: Yes.
* * *
Q: Do you recall the following:
[Foreman]: You said in your testimony that you believed the tall, lean one did the shooting?
Witness: Yes.
Foreman: What made you think that when you didn't see anything until you turn around and there was a man standing a few feet from you with a gun?
Witness: Because I could see where Coleman was supposed to be at the store and the other guy was over by him, the tall, skinny one.
Q: Did you testify to that?
A: Yes.
Q: Unless my math is incorrect, that's four times you said it was the tall, skinny one that did the shooting?
A: Uh-huh.
Q: And on three separate occasions, the last one being under oath.
* * *
Consequently, the Defendant cannot show that receiving the testimony just before cross-examination significantly impaired his ability to impeach the witness and thereby deprived the jury of the opportunity to consider all factors bearing on Tesnear's credibility. State v. Williams, 448 So.2d 659, 665 (La.1984) (late disclosure did not deprive the defendant of a fair trial when counsel fully explored the evidence during cross-examination of the State's witness). This assignment lacks merit.
The Defendant additionally argues that there was a Brady violation because he was not given a copy of Shinberger's grand jury testimony. In her grand jury testimony Shinberger stated that the Defendant was the one giving the orders. However, when asked who fired the gun at Coleman, she answered, "the tall one working on me." When the prosecutor followed up by asking, "You believe he is the one that fired the shots," Shinberger responded, "Yeah, I'm sure." When the Grand Jury Foreman asked her whether she saw the tall man shoot the victim, she stated that she did. She also said that as the Defendant was leaving he told the others to knock Shinberger and Tesnear out.
Shinberger's grand jury testimony is clearly exculpatory. Nevertheless, it does not appear that its suppression denied Defendant a fair trial. Although the defense did not have Shinberger's grand jury testimony, and in fact has never seen it,[12] the State turned over both statements which she gave to the police. In her first statement, taken on August 12, 1995, when she was asked how many people she saw with guns Shinberger stated, "I seen one, the one was behindwith me at the register... I don't even know who shot who...." However, Shinberger gave a second statement on August 22, 1995, in which she implicated Elbert Williams as the shooter.[13] At the end of her statement Shinberger added:

*883 The only thing I can remember is the fat one told the one with the gun on the way out "knock them out." So he was the one giving the orders.
Despite its possession of these statements, Shinberger failed to appear for trial. Although Shinberger was more confident in her grand jury testimony about the identity of the shooter, the grand jury testimony was cumulative in nature. Consequently, the Defendant cannot show that the failure to turn over the grand jury testimony constitutes reversible error.

PENALTY PHASE ISSUES

Other Crimes Evidence
In Assignments of Error Thirty-Six and Thirty-Seven, the Defendant argues that other crimes evidence was erroneously admitted as character evidence. During the penalty phase of trial, Joyce Gorecki, a cashier at the Kroger grocery store in Shreveport, was allowed to testify with regard to the armed robbery occurring at the store on August 9, 1995.
La.Code Crim. Proc. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members." Rules governing the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the Defendant's character and propensities have evolved jurisprudentially. In State v. Brooks, 541 So.2d 801 (La.1989), this court approved the State's introduction in its case-in-chief in the penalty phase of two unrelated and unadjudicated murders once the trial judge determined that: (1) the evidence of the Defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the Defendant's character and propensities. State v. Brooks, 541 So.2d at 814. In State v. Jackson, 608 So.2d 949 (La.1992), the court granted pre-trial writs to establish limitations on admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings.[14] There, the court ruled that the evidence of the unadjudicated criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. State v. Jackson, 608 So.2d at 955. More recently, in State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16, 21, this court noted:
At the outset, it is important to note that the judge, and not the jury, determines the admissibility of the evidence of unrelated criminal conduct by determining whether the defendant's commission of the criminal conduct was proved by clear and convincing evidence and whether the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities.
In the instant case, at the pretrial hearing on the admissibility of other crimes evidence in the penalty phase, after hearing the evidence the judge ruled:
Well, the issue for the Court at this stage is to determine whether or not it's relevant to be admitted for consideration of the jury. Now, as to how much is to be put on is an issue with the District Attorney. I think the only issue the Court has right now is to determine whether there is relevance of these facts to be used in 905.2. We find that they are all relevant to that issue. Now, the jury is going to have to determine whether or not there is a sufficient basis *884 to meet its standard of clear and convincing evidence.
Defendant is therefore correct in his assertion that the trial court clearly applied the inappropriate standard in determining the admissibility of evidence of the Kroger robbery. However, it appears that the error is harmless. As a general rule, deferential standards of review apply to factual and other trial determinations, while determinations of law are subject to de novo review. See, e.g., City of New Orleans v. Bd. of Comm'rs, 93-0690 (La.7/5/94); 640 So.2d 237, 253.
A review of the transcript shows that the State met its burden of proving Defendant's participation in the Kroger robbery by clear and convincing evidence. Joyce Gorecki, a cashier working at the time of the robbery, testified that the Defendant was one of the two robbers and she picked him out of a video tape line-up that she was shown approximately ten days after the crime. She also identified the Defendant in court during the hearing. Consequently, it appears that the evidence was admissible at trial, and this assignment lacks merit.

Prosecutorial Misconduct
In Assignments of Error Thirty-Eight through Forty-Two, the Defendant argues that the prosecutor engaged in repeated misconduct during the penalty phase which violated the Defendant's constitutional rights and mandates reversal. The Defendant first argues that the prosecutor committed reversible error by referring to himself as a representative of the jurors' government in seeking the death penalty during his opening and closing argument in the penalty phase of trial.[15] During his opening statement the prosecutor stated:
Y'all have already begun and in fact completed a large portion of what I know is going to be the most difficult decision any of you will ever be called to make. It's certainly the most difficult decision your government could ever ask you to make. Nonetheless, as I promise you, your government is going to ask you to make that decision. And this is when your government is asking you to start thinking about it right now.
In his closing argument the prosecutor stated:
If each of you don't have a good idea in your mind what you need to do with this case, then your government has completely failed in what it has tried to do; we have completely and utterly failed. But I don't think we have. I think each of you knows. Since each of you now know what your government knew at the beginning of trial, each of you knows now why your government has sought the ultimate penalty of death.
The scope of the State's opening argument is prescribed in La.Code Crim. Proc. art. 766, which provides that it "shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." La.Code Crim. Proc. art. 774 confines the scope of proper closing argument "to evidence admitted, to the lack of evidence, to conclusions of fact that the state or Defendant may draw therefrom and to the law applicable to the case." This court has stated as a general matter that a prosecutor retains considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La.1981). Even when it has found that a prosecutor has exceeded that latitude, the court has often criticized the improper arguments without finding that they constitute reversible error. State v. Jarman, 445 So.2d 1184 (La.1984); *885 State v. Messer, 408 So.2d 1354 (La.1982). Specifically, this court will not overturn a guilty verdict on the basis of improper argument unless "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." State v. Byrne, 483 So.2d at 572; State v. Sanders, 93-0001 (La.11/30/94); 648 So.2d 1272, 1285-1286.
It does not appear that the statements fell outside the proper scope of argument. The prosecutor correctly asserted that he is a representative of the state, and was simply referring to the fact that the state was seeking the death penalty. Even if the prosecutor did over-emphasize the point, it cannot be said that, taken by themselves, the prosecutor's statements that the government was asking the jurors to impose the death penalty created a substantial risk that the death penalty would be imposed under the influence of passion, prejudice, or based on arbitrary factors rather than the evidence produced at trial. See, e.g., State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375. Consequently, this argument lacks merit.
The Defendant also argues that the prosecutor committed reversible error by mischaracterizing the Defendant's juvenile adjudications as felony convictions. In his opening argument during the penalty phase the prosecutor stated, "Bobby Hampton has got four felonies on his record, the first of which arose when he was barely old enough to drive." Subsequently, in his closing argument the prosecutor stated that he had proven to the jury the existence of "four prior felony convictions." As the defense noted, the Defendant actually had two juvenile delinquency adjudications and two felony convictions.[16]
During the penalty phase the clerk read the joint stipulation regarding the Defendant's prior convictions which correctly characterized the two juvenile adjudications and the two felony convictions. Because the jury was properly informed about the four crimes, it is unlikely that the State's mischaracterization of the aggravated battery and second degree battery as felony convictions rather than juvenile adjudications created a substantial risk that the death penalty was to be imposed under the influence of passion, prejudice, or based on arbitrary factors. State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375.
The Defendant additionally argues that his conviction should be reversed because during closing arguments the prosecutor improperly suggested that the Defendant deserved the same punishment that he imposed on his victim, and compared the victim's fate to the Defendant's right to go to trial.
During his closing the prosecutor stated:
Bobby Hampton himself imposed a death penalty on Russell Coleman. Now, how is it that if this life is fair and if law is supposed to be fair, you can ever consider giving Bobby Hampton something like a life sentence that he's given them. Your government is asking you to order that he be executed. He did that to somebody and justice requires that he have that done to him.[17]
Subsequently, during rebuttal he argued:
Basically speaking, Bobby Hampton wants your mercy. That's what he wants. You've seen this picture before, I think. Russell Coleman. Was Russell Coleman given the opportunity to ask for mercy?
The defense objected, and after the jury was removed, moved for a mistrial.
Unlike the argument in some cases in which the prosecutor implies that it is not fair that the Defendant was afforded due process rights which he did not afford to the victim, see, e.g., State v. Hamilton, 478 So.2d 123 (La.1985) (unpublished appendix at pp. xv-xvi) (prosecutor's argument in the guilt phase that while *886 defendant has been afforded every right, the victim "... had none of these rights... [because he] was judge, jury, and executioner..." was improper, but did not contribute to the verdict), the prosecutor in the instant case did not implicate the defendant's due process rights. Rather, the prosecutor simply argued that just as the Defendant failed to show Russell Coleman any mercy, the jurors did not have to show the Defendant mercy. This court has held that this argument is not improper. See State v. Summit, 454 So.2d 1100 (La.1984) (although prosecutor may not suggest that protections to the rights of the accused are inconvenient hindrances, he may compare the trial afforded the defendant to the "summary execution" of his victim, even to the extent of asking the jurors to give defendant the "same justice" that he gave to the victim). Accordingly, the State was not asserting that he was not entitled to due process, and this argument lacks merit.
In addition, the Defendant argues that the prosecutor improperly argued that the mitigating factors presented by the State did not matter and should not be considered. During his rebuttal argument the prosecutor stated:
Let me see if I got this quote right. Bobby Hampton doesn't deserve to die due to the mitigating circumstances. Well, let's see which ones apply, shall we?
The offender has no significant prior history of criminal activity. That doesn't apply ... Oh, oh this is the one. Any other relevant mitigating circumstances. Oh, let's see what the relevant mitigating circumstances are. Let's see. The killing was tragic, but I didn't hear it right that Bobby Hampton didn't kill Russell Coleman? Uh, I thought we decided that. Y'all are the same jury that decided that, right? Non-issue.
A lingering doubt. We can't execute someone based on the evidence we heard. Seems to me that Defense is still arguing something that you twelve people decided yesterday evening about 9:15.
Gee, I forgot this one. Bobby Hampton never knew his father, didn't have a role model. Do all the people you know that don't have fathers commit murder? ...
While it is well settled that the prosecution may not argue that a particular factor should not be a mitigating circumstance, it is perfectly acceptable for the State to try to disprove the existence of a mitigating factor. See State v. Mitchell, 674 So.2d 250 (La.1996) (unpublished appendix) (taken in their entirety, prosecutor's comments regarding the defendant's mitigating evidence of his mental retardation were not unfair and did not invite jurors to reject mental retardation as a mitigating circumstance; prosecutor simply questioned whether the defendant had established that he was mildly retarded and reminded jurors that in any event many mildly retarded individuals lead normal, law-abiding lives). Similarly, in the instant case, the prosecutor's comments were intended to show why the various mitigating factors raised by the defense in its closing argument were not applicable in the instant case, and the prosecutor's comment discarding the fact that Defendant did not have a father simply pointed out that many people raised without fathers do not commit murder. Accordingly, this argument lacks merit.

SENTENCING PHASE ISSUES
In Assignments of Error Forty-Four through Forty-Seven, the Defendant argues that various errors in the sentencing phase injected arbitrary factors which undermined the reliability of the jury's imposition of the death penalty. The Defendant first contends that the admission of evidence and testimony of the Defendant's jail conduct as well as the evidence about the African Terrorism Family materials exceeded the permissible scope of rebuttal.
*887 Limitations prescribed in the Code of Evidence limit the scope of rebuttal testimony at the sentencing phase:
If the defense offers evidence in the sentencing hearing which warrants the prosecutor's rebuttal with evidence of bad character, the trial judge must determine the relevance of the rebuttal evidence according to the nature of the evidence brought by the defense.
State v. Jackson, 608 So.2d 949, 957 (La. 1992). In general, rebuttal evidence is that which is offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party. Control of evidence presented by the State on rebuttal is within the sound discretion of the trial judge whose ruling will not be disturbed except in extreme cases as where the evidence has been kept back deliberately and for the purpose of deceiving and obtaining undue advantage of the defendant. State v. Williams, 445 So.2d 1171 (La.1984). With regard to character testimony, the State's rebuttal is necessarily limited to proof of the Defendant's general reputation, as specific acts are relevant only to the extent to which they test a particular witness's basis of knowledge of the Defendant's reputation. The Defendant may, however, open the door to introduction of specific acts on rebuttal by testifying in his own behalf and making specific claims in support of his own character. State v. Davis, 411 So.2d 434 (La.1982); State v. Constantine, 364 So.2d 1011 (La. 1978).
At the penalty phase, the defense called Deputy Sheriff Don Gibbs to testify about the Defendant's participation in a program at the prison speaking to high school students. Deputy Gibbs stated:
Bobby would speak to a group about would say, you know, not getting involved in say negative activities out in the streets such as like gangs or dealing with drugs or running with the wrong crowd. That could possibly keep them from getting incarcerated as well.
In addition, Deputy Gibbs testified that he never had any problems with the Defendant, although he was aware that the Defendant had been cited for fighting and disobeying orders in the past. On rebuttal the State called Deputy Scott Talbot who testified about the Defendant's disciplinary record, and had compiled an eight page printout of incident reports involving Bobby Hampton at the Caddo Correctional Center. He testified that the Defendant had been in trouble for disobeying orders and fighting with a deputy. Deputy Talbot also testified that the Defendant was cited for possessing gang related materials, specifically handwritten contracts for membership in the African Terrorism Family (ATF). In addition, the State called Deputy Lavario to identify the ATF materials seized from the Defendant's cell.
Considering that the defense put forth evidence during its case that suggested that the Defendant had reformed his behavior while he was incarcerated, the trial court did not err by allowing the State to rebut the evidence with specific instances of his conduct, including his gang related activities while in jail. See State v. Sepulvado, 93-2692 (La.4/8/96); 672 So.2d 158, 166 (The defendant has no right "`to foist a spurious reputation upon the jury' and `if the defense intends to develop a certain view of the defendant's background,' the State should be allowed to elicit information to contradict those assertions.") (quoting State v. Banks, 307 So.2d 594, 599 (La.1975)). Consequently, this argument lacks merit.
The Defendant also argues that he was prejudiced in the penalty phase because even if Gorecki's testimony about the Kroger robbery was otherwise admissible, it should not have been admitted because it was speculative, irrelevant, and constituted hearsay. The Defendant complains that while she was testifying Gorecki added irrelevant testimony:
And then I heard Albert saythe only reason I can tell the difference in their voices is because Bobby Hampton, when he was talking to me about killing me if I didn't give himhe was like if he had *888 run a marathon, very aggressive, very like you could almost feel his heart beat and Albert seemed a little calmer in his voice tone and he wasn't that aggressive pushing, manhandle type thing.
This testimony appears to have been properly admitted as Gorecki was simply explaining how she could distinguish between the two perpetrators.
In addition, the Defendant argues that Gorecki was allowed to testify about facts which she could not have known herself:
I just remember seeing three of the employees on the other side, they had been duct-taped and after hearing me paging they literally had been able to rip and they ripped part of their skin off. And by the time they got up to the counter, I just remember seeing duct tape and blood on their skin. And they said that they heard me page but they were all bound and gagged in the bathroom.
Nevertheless, even if Gorecki improperly included some hearsay in her description of the robbery, given that the jury also heard extensive testimony about Defendant's role in the robbery which was properly admitted, the defense cannot show that this statement introduced an arbitrary factor into the proceedings.
The Defendant also argues that he was prejudiced in the penalty phase when the prosecutor cross-examined his sister, Alberta Mayberry, about the specifics of juvenile adjudication for aggravated battery.[18] The defense did not object at trial, but the failure of defense counsel to object does not preclude review of this asserted penalty phase error. State v. Taylor, 669 So.2d at 369. It appears that the State questioned Mayberry about Defendant's adjudication after she testified on direct that as a child, "He was funny, always laughing, and he helped people a lot, mainly old people." La.Code Evid. art. 611 provides that "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Even if the questioning exceeded the permissible scope of cross-examination, any error was harmless. The jury had already heard, by joint stipulation, that the Defendant was adjudicated delinquent for aggravated battery. Consequently, this court may safely conclude that the sentence in the instant case was "surely unattributable" to the erroneous admission of this evidence. See State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94. This assignment lacks merit.

CAPITAL SENTENCE REVIEW
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Under La.Code Crim. Proc. art. 905.9, this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:

*889 (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
The district judge has submitted a Uniform Capital Sentence Report and the Department of Corrections has submitted a Capital Sentence Investigation Report. In addition, the State and the defense each filed a Sentence Review Memorandum. The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that the Defendant is a black male born on March 3, 1970. He was twenty-five years old at the time of the offense. He married Olivia Hampton on October 10, 1994, and according to Defendant's oldest sister, Alberta Mayberry, they are still married, but Olivia Hampton is presently residing in Texas. The Defendant has no known dependents. The Defendant is the fifth of six children born to his mother, Rose Audrey Hampton. His father, Henry Lee Hampton, Sr. died of gunshots wounds in June, 1969, while Rose Hampton was pregnant with the Defendant. Rose Hampton died of complications from blood clots on September 28, 1997.
According to the Defendant's oldest sister, Alberta Mayberry, the Defendant attended Ingersoll Elementary School from grades one through five, and transferred to Hamilton Terrace for the sixth grade. The Defendant dropped out of school while he was in the seventh grade, at which time he was attending J.S. Clark. However, the Defendant earned his GED while he was incarcerated at Caddo Correctional Center in 1996.
There is limited information concerning other areas of the Defendant's social history. According to Mayberry, at one time Hampton worked for the Shreveport Sun, a local newspaper, and he also did some yard work for individuals. Mayberry said that the Defendant does not have any drug or substance abuse problems of which she is aware. She further added that the Defendant attended church regularly and was a member of the Shower of Blessing Church on Greenwood Road.
The Capital Sentence Investigation Report indicates that the Defendant has previous juvenile delinquency adjudications and adult convictions. As a juvenile, the Defendant was arrested on December 5, 1982, for shoplifting. He was fined $25 and placed on unsupervised probation for six months for that crime. He was arrested and adjudicated delinquent for battery with a stick in October of 1983. He was committed to the Louisiana Department of Corrections (LDOC). He was subsequently arrested and adjudicated delinquent in 1986 for battery and again committed to LDOC for 1 year. In addition to his conviction for the instant offense, the Defendant has adult convictions for simple escape in 1989; aggravated assault in 1990; armed robbery in 1993; illegal carrying of a weapon in 1993; inciting a riot and resisting arrest in 1994. The Defendant also has numerous adult arrests for charges including attempted second degree murder, aggravated assault, illegal possession of stolen things, and interference or obstruction of an officer. According to the Capital Sentence Investigation Report, when the Defendant was released on supervised probation in April, 1993, he violated probation and his parole was revoked after he was arrested for simple battery against his wife and for illegally carrying a weapon. Hampton was also on supervised parole for attempted armed robbery, starting on July 11, 1994. The Defendant satisfactorily completed that period of supervision on April 11, 1995.

(a) Passion, Prejudice, and Other Arbitrary Factors
The Defendant contends that as he has argued throughout his brief to this court, numerous factors at sentencing injected passion, prejudice, and arbitrariness into the proceedings. The Defendant specifically reiterates in his Capital Sentence Review *890 memorandum: use of the shock restraint device, erroneous strikes for cause of prospective jurors, the withholding of exculpatory grand jury testimony, prosecutorial misconduct, ineffective assistance of counsel, admission of inadmissible evidence, erroneous instructions, and the cumulative effect of all of these errors. In addition, the Defendant argues that an inference of arbitrariness arises because the "jury's recommendation of death was inconsistent with sentences imposed in similar cases from the same jurisdiction." State v. Sonnier, 380 So.2d 1, 7 (La.1979). The Defendant also contends that the death penalty is inappropriate in this case because the record does not support the jury's finding of first degree murder, and because the sentence of death is disproportionate to the penalty imposed in similar cases, considering both the crime and the Defendant. All of these factors are treated in depth in the individual assignments of error and in the proportionality review. None of the arguments herein warrant this court's consideration as possible grounds for reversal.

(b) Aggravating Circumstances
At trial, the State argued one aggravating circumstance: that the offender was engaged in the commission or attempted commission of armed robbery, first degree robbery, or a simple robbery. The jury found the existence of this aggravating factor. The testimony of Tesnear fully established that the Defendant entered the liquor store armed with a gun, robbed the employees at gunpoint, and gunned down the victim. Moreover, as previously discussed, even assuming that Elbert Williams fired the fatal shots, the evidence established that the Defendant was the ringleader, giving orders to the co-defendants during the robbery and then advising them to "take out" or "knock out" the remaining witnesses. This evidence supported a rational finding that the Defendant fully subscribed to the victim's murder and that he therefore had the specific intent to kill.

(c) Proportionality Review
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990). La. Sup.Ct. R. 28, § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried in the district in which this sentence was imposed. This court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversed on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979). The state's Sentence Review Memorandum reveals that since 1976 jurors in the First Judicial District Court have returned a guilty verdict in twenty-seven capital cases, including this one, and recommended the death penalty seven times before this.[19] Only four of *891 those cases involved armed-robbery murder. Nevertheless, on a statewide basis, this court has consistently affirmed death penalties in other cases involving killings during the course of a robbery. State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, reh'g denied, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983)(Jefferson Parish); State v. Mattheson, 407 So.2d 1150 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412, reh'g denied, 463 U.S. 1249, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983)(Orleans Parish); State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983)(Jefferson Parish); State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247, reh'g denied, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983)(Orleans Parish); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984)(Bossier Parish); State v. Busby, 464 So.2d 262 (La.1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), sentence vacated, 538 So.2d 164 (La.1988)(Vernon Parish); State v. Thompson, 516 So.2d 349 (La.1987)(Orleans Parish); State v. Messiah, 538 So.2d 175 (La. 1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990)(Orleans Parish); State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617 (Caddo Parish).
In State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, a Caddo Parish case, the defendant shot a Circle K employee three times, including one time between the eyes while engaged in an armed robbery. The next evening, the defendant shot an employee of Fat's Exxon in another armed robbery, which was caught on tape. While the victim was placing small items in a paper bag, the defendant bent down, pulled a pistol out and in one, quick and continuous motion, without saying anything, shot the victim in the chest at point blank range. The victim obviously did not notice or react to the pistol, but was thrown on his back by the gunshot and was immediately on the floor twitching, breathing heavily, and in the throes of death. The defendant immediately shot at the victim's wife and threatened, as he emptied the cash register, to shoot the victim again. Id. at 1017-1018. In State v. Ford, 489 So.2d 1250, 1264 (La.1986), another Caddo Parish jury sentenced a defendant to death for a single-shot armed robbery-murder of an elderly jeweler. The victim's body was found in his watch repair shop. He had been shot once through the head, the shop display cases had been emptied of jewelry and the victim's pockets had been turned out. In State v. Tyler, 97-0338 (La.9/9/98); 723 So.2d 939, a Caddo Parish jury sentenced defendant to death after he entered a Pizza Hut armed with a .22 caliber revolver, ordered the three employees to lie face down on the floor in the cooler after robbing them and shot each one in the back of the head. One employee was killed, and two employees survived without permanent physical injury.[20]
Consequently, a comparison of the Defendant's case with other similar cases indicates that the death penalty would not be disproportionate considering the offender and the offense. Therefore, we do not consider that the defendant's sentence of death constitutes cruel, excessive, or unusual punishment.

*892 DECREE
For the reasons assigned herein, Defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided in La. Rev.Stat. 15:567, until either the Defendant fails to timely petition the United States Supreme Court for certiorari; or that Court denies his petition for certiorari; and either the Defendant, having filed for and been denied certiorari, fails to petition the United Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or that Court denies his petition for rehearing.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, Justice, dissenting.
In the case sub judice, this court has affirmed Defendant's death conviction despite the prosecution's unconstitutional suppression of evidence favorable to Defendant. In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the "prosecution's suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. The facts in Brady are virtually identical to the instant case. Defendants Brady and Boblit were charged with first degree murder while committing a robbery. At trial, Brady admitted participating in the robbery but denied killing the victim. Prior to trial, Brady requested the opportunity to examine Boblit's extrajudicial statements. The prosecution withheld these statements, including Boblit's confession to the actual homicide. Brady was subsequently convicted of first degree murder.
In the instant case, Colette Shinberger testified to the Grand Jury that Michael Williams, and not Defendant, actually shot the victim, Philip Coleman. The Grand Jury Foreman asked her whether she saw Michael Williams shoot the victim and she answered affirmatively. When the prosecutor asked whether she believed that Michael Williams shot the victim she responded "Yeah, I'm sure." Defendant was never given a copy of Shinberger's Grand Jury testimony. Although this clearly exculpatory evidence was suppressed, the majority suggests that Defendant was not denied a fair trial. The majority reasons that Shinberger gave two statements to the police in which she stated that she did not know who shot victim. This is of little consequence because Shinberger told the Grand Jury, under oath, that she was sure Michael Williams was the shooter. In fact, she told police in one statement that the only person she saw with a gun was Michael Williams. The prosecution's failure to provide Defendant with this testimony was an unconstitutional denial of due process.
The exculpatory nature of Shinberger's testimony is bolstered by the fact that Frank Tesnear and Colette Shinberger are the only two surviving witnesses to the robbery. When the police interviewed Tesnear immediately after the robbery, he stated that the third perpetrator, Elbert Williams, was the actual shooter. Tesnear subsequently requested a second interview with police at which time he changed his opinion and stated that Defendant was the shooter. It is important to note that Tesnear did not actually see anyone shoot the victim. He based his conclusion on the trajectory of bullet holes in the doorway of the store and the relative locations of all three perpetrators.
This unconstitutional suppression of exculpatory evidence requires reversal of Defendant's conviction and remand for a new trial on the merits.
NOTES
[*] LEMMON, J., not on panel. See Rule IV, Part 2, § 3.
[1] Several assignments of error were not discussed in this opinion because they do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[2] The sales counter is situated on the north side of the store with the entrance turnstile to its southwest and the exit to it north.
[3] Transcripts from these interviews were not entered into evidence at trial but were given to the defense during discovery.
[4] The pertinent portion of the interview is as follows:

DET. MULLER: Did [Elbert Williams] ever fire this weapon, that you know of?
SHINBERGER: I don't know. I guess they must haveI heard the gunshot and that's when they all came around my register so I don't know which one fired what.
* * *
DET. MULLER: ... Did you see [Coleman] when he got shot?
SHINBERGER: No, sir. All I heard is the gunshot ... saw one gun ... The one was behind me with me at the register. I don't know where the other one's at. I don't even know who shot who, like I said ... because they jumped on me and made me get down of the floor and pull the money out ...
[5] The following discourse occurred outside the presence of the jury:

MR. GOLDEN [defense counsel]: Your Honor, there is one thing unrelated to the charges. We issued a subpoena for Colette Shinberger ... We would like to call her as our witness. That's the only problem as far as our being able to proceed.
THE COURT: Do you have her here?
MR. HOLLAND [prosecutor]: She's served but we don't know exactly where she is now. She was going out with a guy who called us and said that she was gone. And she apparently has charges pending in Bossier and I think I might could get in touch with her, but I believe she's out of state ...
THE COURT: Did you subpoena her?
MR. GOLDEN: I believe she was.
THE COURT: I can't give you a continuance. I will let you make some effort to try to get hold of her, but you're ready to proceed to trial
MR. HOLLAND: Judge, if I could, I believe the State's subpoena was served. We had our subpoena issued a couple of months ago. I know that if y'all said you issued a subpoena that you did, but when I checked the record, I didn't see many Defense subpoenas. That wasn't one of them.
MR. GOLDEN: Can I look at those?
THE COURT: It actually doesn't matter. If we are ready to proceed and the subpoena is issued, no oneyou know the Defense has not objected and had her here, so there is no basis to continue the thing. We will give you an opportunity to try to get a hold of her if you can, but we can't shut the trial down. You said you are ready to proceed, so that's the way it is. But you know now that State is not going to call her and the State is going to make every effort to give you her address of where she is.
MR. HOLLAND: I've got a phone number where I know she might can be reached.
THE COURT: But it's out of state?
MR. HOLLAND: Yes, it is.
THE COURT: All right. Anything else at this stage? All right. I will talk to you. You can continue to do what you want to to [sic] try to get ahold [sic] of her.
[6] The following bench conference occurred in out of the presence of the jury during the State's closing argument:

THE COURT: All right. I will let you put your objection on the record.
MR. GOLDEN: Your Honor, I would like to note for the record that Mr. Holland made two references to the fact that Mr. Tesnear's testimony was uncontraverted [sic] and then he said there were other people who could contravert [sic] it ... The basis for the objection is that it's an impairment of Mr. Hampton's Fifth Amendment right not to testify. The implication by saying that something that a witness said was uncontradicted is that Mr. Hampton did not take the stand to in fact contradict it. I understand that there were other witnesses that possibly could have been called, but still the implication is left to the jury that Bobby did not testify. I think it's calling attention to that.
MR. HOLLAND: My response, your Honor, is, and I'm going to basically quote this. Mr. Golden said that there was a big grey area where people were at time of the shooting. He said that in his opening and yet he produced no evidence to show that there was that grey area and there were not just Mr. Hampton but Colette Shinberger, Michael Williams, and Elbert Williams in the store he could have called and he chose not to. So that's what the State's referring to []I would agree with Mr. Golden if there were only two people in the store, Mr. Tesnear and Bobby Hampton, but that's simply not the case.
* * *
THE COURT: I understand your objection. I do not think it's proper in this case because there were other individuals in the store of which, and that was stated, of which the defendant had subpoeanaed [sic]. And that is Ms. Colette Shinberger, who did not testify. Those people also were subpoeanaed [sic] by the State. So I do not think that the reference that Mr. Holland said was an indirect reference to the Fifth Amendment privilege that Mr. Hampton has and didn't wish to exercise in connection with this case ...
MR. GOLDEN: Your Honor, note my objection. And also, I would like to note for the record the following facts. The other eyewitness who is not part of the offense, Ms. Colette Shinberger, is currently out of the state and unavailable. She's in Colorado Springs. That information was given to us by the District Attorney's Office. I believe they would agree with that.
The second thing is the other two witnesses are co-defendants who have pending charges for first degree murder and pending trials. So in reality, we really did not have other witnesses we could not call.
THE COURT: The jury did not know that. The issue is the effect on the jury.
* * *
THE COURT: All right. The [objection] is noted and overruled.
* * *
[Emphasis added]
Note: during oral argument in this matter, this court was informed that the First Judicial District Court maintains a file of subpoena requests separate from the record in each case in its clerk's office and routinely destroys these subpoena requests once trial has concluded.
[7] La.Code Crim. Proc. art. 712 provides, "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefore."
[8] Although Sandra Lucky testified that she was handed a bottle of gin, she stated that Elbert Williams, not the Defendant, gave her the bottle.
[9] See footnote 5.
[10] Moreover, the Defendant's statement that his co-defendants should "Take them out," supports that even if he was not the shooter he had the requisite mental state to be a principal to murder. The Criminal Code does not define "great bodily harm." However, the somewhat analogous "serious bodily harm" is found in second degree battery, La. Rev Stat. 14:34.1, and is defined in part as "bodily injury which involves unconsciousness, extreme physical pain...." Accordingly, even if the Defendant simply intended to knock out Shinberger and Tesnear it suggests that he had the requisite specific intent to kill or grievously harm all of the employees in the store.
[11] Tesnear stated in his grand jury testimony:

I asked Coleman where the trash bags were at. I walked down the hall. There was four bangs. I looked around. The guy was standing by him, had a gun to him. He said, lay down. Another guy came running to me and said: Lay down.
[12] By order of December 12, 1997, appellate counsel's motion to unseal the record and to provide her with access to Shinberger's grand jury testimony was referred to the merits of the appeal.
[13] In contrast to her grand jury testimony, her recollection in the August 22, 1995 statements implies that she did not actually see the shooting. She states at one point, "Because that's what it sounded like at first [firecrackers] you know. And I looked up and I didn't see Russ anywhere ..."
[14] State v. Jackson, 608 So.2d 949 (La.1992), also incorporated the three-pronged test from State v. Brooks, 541 So.2d 801 (La.1989). State v. Jackson, 608 So.2d at 956.
[15] The defense did not make any objections during the State's opening or closing arguments during the penalty phase of trial. The lack of objection does not preclude review of sentencing phase errors but may reflect counsel's subjective assessment as to the prejudicial impact of the remarks on the jury. State v. Taylor, 93-2201, n. 10, 669 So.2d at 376 ("[T]he lack of objection demonstrates defense counsel's belief that the live argument, despite its appearance in the cold record, was not overly damaging.")
[16] The adjudications and felony convictions were admitted by stipulation during the sentencing phase of trial.
[17] Defense counsel did not object.
[18] Q: ... I know that since you are here, you know that your brother killed a man in cold blood, right?

A: I don't know that.
* * *
Q: Do you not agree with their verdict?
A: I don't agree with their verdict.
Q: Do you know if he didn't do this?
A: I don't know what he did.
Q: Do you know that Bobby has it in him to do that?
A: No.
Q: Well, and again, Ms. Mayberry, I'm sorry you have to be here. I just want to know what your personal feelings about this are.
A: Okay.
Q: He was locked up a bunch as a kid, right?
A: Uh-huh.
Q: And that was locked up for hurting people, wasn't it?
A: He was locked up one time as a kid.
Q: Well, and that one time was for beating a man with a pipe, wasn't it?
A: Yes.
[19] State v. Cedric D. Edwards, 177, 994 First Judicial District, 97-1797 (currently on appeal); State v. Cooks, 97-0999 (La.9/9/98); 720 So.2d 637; State v. Tyler, 97-0338 (La.9/9/98); 723 So.2d 939; State v. Davis, 151,074 First Judicial District, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617; State v. Code, 138,660 First Judicial District, 627 So.2d 1373 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491, reh'g. denied, 512 U.S. 1248, 114 S.Ct. 2775, 129 L.Ed.2d 887; State v. Felde, 109,803 First Judicial District, 422 So.2d 370 (La.1982); State v. Ford, 126,005 First Judicial District, 489 So.2d 1250 (La. 1986). State v. Davis, State v. Ford, State v. Tyler, and State v. Edwards, involved armed-robbery murders.
[20] The most recent case of an armed-robbery murder resulting in a death sentence in Caddo Parish, State v. Edwards, 97-1797 (currently on appeal), is somewhat distinguishable as the robbery and murder occurred in the victims's home, rather than a commercial establishment.