# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-407

**STATE OF LOUISIANA**

**VERSUS**

**MATT MASON, JR.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. #22-2336
HONORABLE KATHY A. JOHNSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## GUY E. BRADBERRY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P.O. Box 1481**
**Monroe, LA 71201**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT:**
    **Matt Mason, Jr.**

**Bradley R. Burget**
**District Attorney**
**Austin Lipsey**
**Assistant District Attorney**
**Seventh Judicial District Court**
**4001 Carter Street, Room 9**
**Vidalia, LA 71373**
**(318) 336-5526**
**COUNSEL FOR:**
    **State of Louisiana**

**Matt Mason, Jr., #787542**
**Louisiana State Penitentiary**
**Camp C**
**Angola, LA 70712**

**BRADBERRY, Judge.**

Defendant, Matt Mason, Jr., was charged by grand jury indictment with the second degree murder of Tyberia Bell, a violation of La.R.S. 14:30.1. After a trial by jury, he was convicted of the charged offense and was sentenced to serve life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. He is before this court appealing his conviction.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent regarding the advisement of the time period for filing an application for post-conviction relief.

We find the trial court did not accurately advise Defendant of the time period for filing post-conviction relief. At sentencing, the trial court informed Defendant he had "two years from the date of your sentence to apply for post-conviction relief." According to La.Code Crim.P. art. 930.8(A) (emphasis added), the time period for filing post-conviction relief is "two years after the *judgment of conviction and sentence has become final*[.]"

The first, second, and fifth circuits have allowed their opinions to serve as notice to Defendant of the correct time limitation for filing an application for post-conviction relief:

> Finally, after the trial court imposed the sentences herein, it failed to advise the defendant of the applicable time period to file an application for post-conviction relief. . . . At the time of sentencing, the trial court shall inform the defendant of the prescriptive period for applying for post-conviction relief. **State v. LeBoeuf**, 2006-0153 (La.App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Its failure to do so, however, has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. Further, the Article does not provide a

remedy for an individual defendant who is not told of the limitations period. **Id.** at 1142-43.

Out of an abundance of caution and in the interest of judicial economy, we advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Id.** at 1143.

*State v. Folse*, 23-1299, p. 11 (La.App. 1 Cir. 9/20/24), __ So.3d __, __ (2024 WL 4245979). *See also State v. Sajna*, 23-893 (La.App. 1 Cir. 9/20/24), __ So.3d __, (2024 WL 4248425); *State v. Green*, 54,955 (La.App. 2 Cir. 4/5/23), 361 So.3d 546; *State v. Franklin*, 23-524 (La.App. 5 Cir. 8/28/24), __ So.3d __ (2024 WL 3963967), *clarified on reh'g*, 23-524 (La.App. 5 Cir. 9/19/24) (unpublished opinion) (2024 WL 4247537).

We agree. We advise Defendant that pursuant to La.Code Crim.P. art. 930.8, no application for post-conviction relief, including applications seeking an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under La.Code Crim. P. arts. 914 or 922.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant contends the State did not prove his guilt beyond a reasonable doubt. Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder in pertinent part as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." We find the following testimony and evidence presented at trial were sufficient to prove Defendant's guilt beyond a reasonable doubt.

Latoya Sheree Corey, formerly Coleman, a dispatcher with the Vidalia Police Department, testified that at approximately 8:15 a.m. on August 21, 2022, she

received a call from a person identifying himself as Matt Mason, Defendant. Defendant asked for police assistance in getting his clothes from his ex-girlfriend's house located at 605 Laurel Street. Mason informed the dispatcher that he would be driving a blue Jeep. Ms. Corey advised Defendant to call once he arrived at the residence, which he did. During the second call, Ms. Corey affirmed that Defendant was adamant that he did not want to go to the house until an escort was present.

Cole Hornsby, a Vidalia police officer at the time, testified that he met Defendant at the residence to assist him. Defendant told him that he and the victim had been in a relationship but split up a few months prior. Defendant told Officer Hornsby that he had an injured foot. Officer Hornsby and Defendant knocked on the front door and a bedroom window, but there was no response. Officer Hornsby told Defendant they could try again later that evening. A couple of hours later, around 10:00 a.m., Officer Hornsby was advised there was possibly a deceased body located at the residence.

Quanza Cubie, the victim's niece, testified that her aunt dated Defendant for two or three years. On July 7, 2022, the relationship ended, and she did not see the two of them together after that time. Shortly after the breakup, the victim put Defendant's belongings in the trunk of her car, where they remained until her death. Ms. Cubie testified that after the breakup, for added security, the victim added a chain lock to one of her doors. Once the crime scene was cleared, Ms. Cubie entered the house and noticed the chain lock was gone.[1]

Investigator Robert Cross of the Vidalia Police Department testified that on July 7, 2022, he received a call that Defendant was attempting to commit suicide at

---

[1]Ms. Cubie's testimony about the lock could be viewed as inconsistent. At some points she said the lock was gone, but when asked whether it was functioning properly, she said "No."

the victim's home while she watched. The victim asked that Defendant be removed from her residence, which police did. While police were there, a firearm was located outside the house under a pile of tin. Police advised Defendant not to return to the victim's home without a police escort.

Danny White, a long-time friend of the victim, testified that when the victim and Defendant broke up, Mr. White was called by the police to pick up Defendant from the victim's house, as he was no longer welcome there. Mr. White testified that he heard the police tell Defendant to stay away from the victim's house unless he had a police escort. After the two men left the victim's house, Defendant asked Mr. White to talk to the victim, saying he had "too much invested there." Mr. White told him to take the loss and move on. To Mr. White's knowledge, the victim and Defendant never reconciled. After the breakup, at the request of the victim, Mr. White changed the locks on the victim's front door and on another door facing the street corner.

Mr. White testified that he saw the victim in his family's bar, Danny's Lounge, on the night of August 20, 2022. Before 8:00 a.m. the following morning, Defendant called him and told him he was waiting on the police so he could retrieve his belongings from the victim's house. Defendant called Mr. White several more times that morning, which was unusual according to Mr. White. Mr. White testified that he also got a call from Ms. Myles, the victim's friend, expressing concern about her. After Mr. White learned of the victim's death, he let Defendant know and also told him it looked like Defendant did it. According to Mr. White, Defendant was "like a little kid be crying like - - like fake crying." It did not seem to be sincere, according to Mr. White.

Ms. Carolyn Slack Myles, who considered the victim her best friend, testified that she and the victim spoke daily. On the night in question, after the two left Danny's Lounge, they went to the victim's house for Ms. Myles to get her car. She decided to stay and eat with the victim and then left the victim's house around 11:45 p.m. Ms. Myles learned of the victim's death the following morning. According to Ms. Myles, the victim and Defendant had been broken up for approximately two months at that time, and the relationship had not resumed.

Troy Fair, a close friend of the victim, testified that he was an employee at Danny's Lounge, working security as needed. On the night in question, Mr. Fair saw the victim and her friend, Ms. Myles, at Danny's Lounge. Shortly thereafter, Defendant entered the bar. When he did, the victim tried to leave, but Mr. Fair told her he would not let Defendant get near her. The victim and Ms. Myles stayed, and Mr. Fair walked the two to their car and watched them leave.

On August 21, 2022, Investigator Cross, who had responded to the call about the Defendant's attempted suicide in July, took photographs of the crime scene and secured the victim's cell phone. Defendant's name came up during the course of investigation. A search warrant was obtained, and Investigator Cross examined the victim's phone. On it, he found text messages sent around the time of the murder. At 12:13 a.m., Ms. Myles texted to let the victim know she was home, and she and the victim texted each other goodnight. The next morning at 8:25 a.m., Ms. Myles texted the victim that "he" was on his way with police to get his stuff per Mr. White. At 9:22 a.m., Ms. Myles texted the victim, asking if she wanted her to go over to the victim's house. Then at 9:43 a.m., Ms. Myles texted the victim saying that she was heading to the victim's house. These three messages remained unread.

During the investigation, Defendant's cell phone was searched as well. The last message he sent on August 20, 2022, was at 6:58 p.m., and the next message he sent was on August 21, 2022, at 9:03 a.m., both work-related. The phone showed Defendant called someone named Hink at 11:01 p.m. on August 20, 2022, and there was an incoming missed call at 11:16 p.m. on August 20, 2022. The next phone call was at 4:12 a.m. from someone named Khan. From 11:16 p.m. until 4:12 a.m., there were no calls. There was a similar break in the text messages. According to Investigator Cross, this gap in communication could be due to the cell phone not connecting to a tower or being powered off. During the break, there was no phone activity whatsoever. Cell tower activity showed Defendant's phone "pinged" off the cell tower close to Danny's Lounge, and then there were no other "pings" after that.

Investigator Cross read aloud the numerous text messages sent from Defendant to the victim from July 5, 2022, to July 28, 2022. The victim responded to very few. None contained an invitation for Defendant to go to the victim's house, and there was no indication that the victim desired to resume the relationship. Investigator Cross also obtained video footage from area cameras. He obtained footage from August 20, 2022, at 11:00 p.m. through August 21, 2022, at 3:00 a.m. which showed a blue open cab Jeep, the same one driven by Defendant during the time of the investigation. According to Investigator Cross, it took about two weeks to compile the timeline video from the footage they collected from various places in the area of the victim's home. He explained during his testimony that not all video footage he collected contained accurate timestamps. He explained how he dealt with this issue:

> **A**    In my report I had it labeled where it said, see time variations, where I had it submitted where if I come [sic] to a camera system where the camera was off, how I would check that, I would go to the live feed

6

and then check the real time and then just use a simple math to say, hey, the camera was off an hour, you know, and calculate it like that.

**Q**    And were you able to successfully compile all the video surveillance into one time - - continuous timeline?

**A**    Yes.

. . . .

**Q**    So again, explain to the Jury how you were able to deduce what was the correct time on these cameras.

**A**    Whenever I got to a place where I was going to achieve - - retrieve camera footage from, some of these DVRs will probably be ten years old. They never set the time correctly on it. So when I got to live feed, I look at the real time, and I can see if it was an hour, hour and twenty minutes off. It's just a simple math, and then when you go back to the recording you can get the correct time just by using a simple math.

**Q**    And do you recognize this report?

**A**    Yes.

**Q**    All right. Do you note those time discrepancies on the report?

**A**    Yes.

**Q**    And will you please explain to the Jury which videos and the time that's off on them?

**A**    I have on here timestamp variations. The other locations have the correct timestamps, but on here I have three that I had an issue with the time being off. The first one will be the 404 Wall Street cameras. They were one hour behind from actual real time. 101 Alabama Street, we calculated one hour and forty minutes behind the actual real time. And the third one, Riverfront cameras north, this is the north camera, thirty minutes behind from real - - actual real time.

Investigator Cross explained that he inserted "narrations" in the police video timeline to clear up the time variations, and defense counsel was allowed to cross-examine him regarding these discrepancies.

Captain Jimmie Watts, chief investigator of the Vidalia Police Department, testified that after he was informed that the coroner determined the manner of death

was strangulation, he, along with other investigators, went to the scene, secured it, and took photographs and video footage. Two large black zip ties were found underneath the nightstand in the victim's bedroom, another was found in her living room, and another was found in Defendant's belongings located in the victim's car. Forensic Pathologist Dr. Christopher Tape performed the autopsy on the victim. His findings indicated that she died of homicide by ligature strangulation inflicted by some type of ligature roughly 0.4 centimeters wide.

Additionally, investigators found a binder in the living room next to the home computer which contained a page listing Defendant's phone number, his employer, address, phone numbers, and rate of pay. A container of Clorox wipes was found in the victim's bedroom, and Captain Watts testified that Defendant's DNA was found on the container.

Captain Watts testified that he learned Defendant had been at the victim's house earlier that morning to retrieve his property and that an incident had previously occurred between the two a few months prior. On August 21, 2022, Captain Watts interviewed Defendant at the police station, and the statement was played for the jury. During the interview, Captain Watts saw Defendant's foot injury, which he felt was severe. Defendant walked with a limp as a result. In his statement to Detective Watts, he said he went straight from Danny's Lounge to Andrew's Bar, which, according to Captain Watts, is only four or five miles away. In the statement, Defendant denied going anywhere near the victim's neighborhood.

According to Captain Watts, Defendant did not seem upset by news of the victim's death, and during the interview, he went from referring to the victim as the woman he loved more than his own mother to referring to her as "that woman."

After the interview, Captain Watts attempted to verify the information provided by Defendant. He obtained video from Andrew's Bar, but the video footage from Andrew's Bar showed him arriving at 3:00 a.m. In his statement, Defendant also told police that on the night in question, he was wearing black pants and a white t-shirt, but the video from Andrew's Bar showed him wearing black pants, a black shirt, and a black ball cap. Because Defendant lied about his time of arrival and his clothing, Defendant became a suspect. Captain Watts also attempted to verify Defendant's home address he provided, a place he said he lived with his wife and child. When Captain Watts arrived at the address provided by Defendant, he learned Defendant had not lived there for several years. When Captain Watts later located the Defendant's actual residence, he obtained the black clothes worn on the night of the victim's murder from behind Defendant's child's bedroom door. During the interview, Defendant blamed the murder on Ms. Myles who had been with the victim the previous night.

Captain Watts testified that at the end of the first interview, Defendant was told they were keeping his cell phone, which would be returned to him later. Defendant returned to the police station on August 23, 2022, and when he was asked for a sample of his DNA, Defendant told Captain Watts, "I would be charged with murder," and he said there was no reason his DNA should be at the scene. Defendant was again released after this interview.

According to Captain Watts, at that point, the investigative team focused on gathering surveillance from areas surrounding the victim's home. According to Captain Watts, this took quite some time despite the fact several investigators were assigned to assist. Captain Watts obtained traffic camera footage from the Mississippi River bridge from August 21, 2022, at 8:39 a.m., the day the victim was

found deceased. Defendant's Jeep was shown going into Natchez, Mississippi, at 8:39 a.m. However, Defendant had told officers he went to work in Clayton, Louisiana, after he left the victim's house that morning.

Additionally, Captain Watts testified that police obtained video footage from near the victim's home showing Defendant riding by the victim's house shortly after she and Ms. Myles left to go to Danny's Lounge. Captain Watts testified that the clothes and shoes worn by the individual in the video matched the clothing retrieved from Defendant's home and the shoes he wore every time Captain Watts spoke to him. The suspect's walk was also consistent with the limp Defendant had from his foot injury.

He then parked "up the street" and walked to the residence. The person seen walking in the video was favoring his right leg and had "almost a limp." The timeline of the video was 8:30 p.m. to 4:00 a.m. In his statement to law enforcement, Defendant had denied going to the victim's house.

Captain Watts testified that the video showed that Defendant arrived on the victim's property at approximately 12:40 a.m. and stayed for one hour and forty-four minutes before leaving at approximately 2:44 a.m. This conflicted with the information Defendant provided to law enforcement, that at 1:30 a.m. he was at Andrew's Bar and then at Hucky's Bar. Captain Watts identified a photograph showing Defendant entering Andrew's Bar at 3:00 a.m. wearing the clothes seen in the earlier video footage from near the victim's house. When Defendant left the bar, Mississippi Department of Transportation cameras showed him going back to the victim's neighborhood in Vidalia and then to Hucky's Bar in Natchez, where he arrived at approximately 3:45 a.m. At 8:25 a.m., he showed up at the victim's home to retrieve his property.

Captain Watts identified a photograph showing that the clasp of the locking mechanism (a chain lock) on the victim's door was missing. He testified that the locking mechanism was pulled away from the door and the bolt holes were protruding outward as though they had been pulled off the door. He testified that to the best of his knowledge, Defendant did not have a key to the victim's residence. According to Captain Watts, Defendant lied to law enforcement about the clothes he was wearing on the night in question, his home address, the time he arrived at Andrew's Bar, and about not being in the victim's neighborhood on the night in question.

When asked about the Jeep seen in the videos, Captain Watts affirmed that it was not possible to see Defendant's face in the videos. However, he testified that of the couple of hundred Jeeps in the area, he had never seen a Jeep that looked like Defendant's.

Katie Traweek of the North Louisiana Crime Lab, accepted by the court as an expert in forensic DNA analysis, testified that her testing of a swab of suspected blood taken from the victim's left fingernail clipping revealed a mixture of DNA from two individuals, the major contributor being the victim. The minor contributor was undetermined because there was too little DNA for comparison. The swab from the victim's right fingernail clippings revealed that the major contributor was the victim, and the minor contributor was Defendant. Ms. Traweek testified that the probability of finding that same DNA profile from someone other than Defendant was approximately 1 in 1.03 trillion. Ms. Traweek testified that she would not expect to see someone else's DNA under a victim's fingernails six weeks after being "broken up" from that person. She explained that DNA under the fingernails is more likely from direct contact than it is from secondary contact such as touching someone

11

else's belongings. Ms. Traweek's opinion was that there had been primary contact between the victim's nails and Defendant.

The swab of suspected blood from the right fingernail clipping revealed that the major contributor of the DNA was the victim, and the probability of the minor contributor being someone other than Defendant was 1 in 3.22 thousand. A swab from the lid of the Clorox container revealed a mixture of DNA from three people, and the victim and Defendant could not be excluded as contributors. Defendant's DNA was not found on the blood on the bed sheets.

Julie Mason, Defendant's sister, testified that she always knew her brother to be non-violent and one who did not fight during conflict, preferring instead to create distance. Verhaunda Norman, Defendant's first cousin, described Defendant as a calm, hard-working, jovial, country man. She never saw him violent or angry and testified he was not good at judging time. According to Ms. Norman, Defendant's home address in 2021 and 2022 was 13 Front Street, the address listed on his ID. Lanara Washington, Defendant's sister, described her brother as kind-hearted, quiet, and willing to help anyone. She testified he was not a violent person, and during conflict, Defendant would smoke a cigarette. She described Defendant as being able to manage his time.

LeAnn Crawford, a licensed private investigator, testified that she found nothing in the background check of Defendant. In her check of the victim, she found a protective order that the victim had obtained against her former husband, Mr. Bowman, who lived "around the block" about two minutes from the victim. Her search further revealed Mr. Bowman had previously been convicted of disturbing the peace (1998), simple criminal damage to property (1999), and simple assault (2002). In her interviews with Defendant, he did not seem angry; rather, he was

12

upset about the victim's death. Ms. Crawford testified that although the protective order against Mr. Bowman was secured in 2018, a final order for protection was never obtained.

On appeal, Defendant contends the State's case rested on a determination that Defendant did not correctly account for his time around the time of the victim's murder, that a Jeep of "indeterminate color" was seen in the victim's neighborhood, and the videos did not all have time stamps to match the timeline set out by police. Additionally, Defendant argues that had he been present on the night of the murder, he could have retrieved his belongings at that time. He asserts that seeing the victim out that night simply reminded him that he needed to get his belongings from the victim. Defendant claims his DNA found in the house was not unusual given the fact he lived there for approximately two years. Furthermore, he contends that the DNA found under the victim's fingernails could have easily been deposited when the victim transferred Defendant's belongings from her house. Finally, Defendant notes there were no scratches on him indicative of a struggle.

The test for insufficiency claims is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

For cases involving both direct and circumstantial evidence, the supreme court has stated:

> An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude *beyond a reasonable doubt* that defendant was guilty of every essential element of the crime.

*State v. Sutton*, 436 So.2d 471, 474 (La.1983) (emphasis in original).

We find the State proved Defendant's guilt beyond a reasonable doubt. The evidence presented at trial established that Defendant's relationship with the victim ended a couple of months prior to the murder, and on July 7, 2022, he was forbidden from returning to her home without a police escort. From the time of the breakup, numerous text messages from Defendant to the victim went unanswered, and the few that were answered contained no invitation to see the victim or resume the relationship. Defendant denied being around the victim's home near the time of the murder, but he was seen on video near her house shortly after she and her friend left to go to Danny's Lounge and then entering her house on the night prior to the morning her body was discovered. Additionally, Defendant's DNA was found under the victim's fingernails and was believed by the State's expert witness Katie Traweek to be a primary transfer from Defendant. As for Defendant's argument that not all the videos had time stamps to match the police timeline video, the time discrepancy was explained during Investigator Cross's testimony, and he was subject to cross-examination by the defense. Considering the evidence presented in this case in a light favorable to the prosecution, a rational juror could have concluded

14

beyond a reasonable doubt that Defendant was guilty of the second degree murder of the victim. Accordingly, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

On appeal, Defendant challenges the admissibility of his statement to police, referring to specific points in his recorded statement: State's Exhibit 145 at 17:02 and 18:24 and State's Exhibit 157 at 12:47. He contends that at these points, he requested counsel, and his interrogation was not terminated as required by law. For this reason, Defendant contends his rights were violated, and his statement should have been suppressed. The State contends that although Defendant did invoke his right to counsel, he subsequently initiated conversations with law enforcement during which his statements were made.

Defendant filed a motion to suppress, alleging that no statements past the first request for an attorney should be admitted in evidence as Defendant invoked his right to counsel, and all evidence gained as a result of the unlawful interrogation should be suppressed. Specifically, Defendant referred to several points in his videotaped statement (165500-1):

> -7:29 Captain Watts asked him if he wanted an attorney and Defendant responded, "Is that possible?"

> -7:46 Captain Watts ignored Defendant's request and asked him to waive his right to counsel.

> -8:32 Defendant indicated he did not understand his rights.

> -9:04 Defendant asked, "Is it possible to have a lawyer present?"

> -9:09 Captain Watts said, "If you want an attorney, that's your right." Defendant shook his head up and down indicating "yes" and then said, "I'd really rather have one."
>
> In the motion to suppress and the hearing thereon, the defense limited its

challenge to 165500-1 to points that correspond with State's Exhibit 147 at or about

15

17:02, the portion of the statement now challenged on appeal. The remaining two points of the statement challenged on appeal, State's Exhibit 145 at 18:24 and State's Exhibit 157 at 12:47, were not raised in Defendant's motion to suppress and are thus not properly before this court:

> Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. *State v. Brown,* 434 So.2d 399 (La.1983) (rejecting defendant's alternative argument regarding the denial of his motion to suppress because he had not raised the issue at trial); *State v. Johnson,* 07–1040 (La.App. 4 Cir. 9/10/08), 993 So.2d 326 ("failure to raise a ground for suppressing an item of evidence in a properly filed motion to suppress waives such a basis for exclusion on appeal"); *State v. Jackson,* 04–1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, *writ denied,* 05–1740 (La.2/10/06), 924 So.2d 162 (defendant is limited on appeal to the grounds he articulated at trial and a new basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal);[16] *see* La.C.Cr.P. art. 841 (providing that a new basis for an objection cannot be raised for the first time on appeal).

> [fn 16] In *Jackson*, the court found that while the defendant challenged the voluntariness of his confession, neither his written motion nor the evidence presented at the motion hearing alleged that the statement was involuntarily because of his young age or because he was sleep deprived at the time of the statement. The defendant was not allowed to raise these new bases for suppression of his statement for the first time on appeal, and therefore, they were not properly before the appellate court.

> . . . .

*State v. Montejo*, 06-1807, pp. 22–25 (La. 5/11/10), 40 So.3d 952, 967–68, *cert. denied*, 562 U.S. 1082, 131 S.Ct. 656 (2010).

Accordingly, this court reviewed the video of the interrogation at the points challenged on appeal that were raised in Defendant's motion to suppress. At the hearing on the motion to suppress, Captain Watts testified that Defendant, a suspect, was first interviewed on August 21, 2022. He was not under arrest at the time. Law enforcement learned, in speaking with family members, that the victim had recently broken up with Defendant. Additionally, earlier that morning, police responded to

a call to assist Defendant in obtaining his belongings from the victim's home. Finding this odd, law enforcement wanted to speak with Defendant to find out whether he knew anything. Captain Watts, along with Investigator Mark David, interviewed Defendant with Captain Watts taking the lead. Much of Captain Watts' testimony focused on what was shown in the video. Defense counsel asked that the portions of the video played for the judge be limited to the times outlined in the motion to suppress. It appears that at the hearing, the video was played from about 6:00 or 6:30 to show the reading of Defendant's rights and where Defendant said he did not understand the waiver. At this point in the video, defense counsel argued that Defendant had verbally requested an attorney three times. The video continued to be played until the point Defendant signed the "advice of rights" form. Initially, while being read his *Miranda* rights, Defendant was told he had the right to talk to a lawyer for advice before questioning and to have one present during questioning. Defendant asked whether that was possible, and Captain Watts stated that if he could not afford a lawyer, one would be appointed to him before questioning if he wished.

At the suppression hearing, Captain Watts testified that when Defendant asked if it was possible to have an attorney, he took this as a suggestion, so he continued reading Defendant's rights. Defendant was then told if he decided to answer questions without an attorney present, he had the right to stop answering at any time and could stop answering until he spoke to an attorney.

Defendant was asked whether he could read, and when he indicated he could, Captain Watts handed him the waiver of rights form to review. Defendant struggled with some of the words and then indicated he did not understand. He confirmed that he understood his rights, but he did not understand the waiver. Thus, Captain Watts read the waiver to Defendant and explained that it meant Defendant understood his

17

rights and wanted to speak to them. Defendant asked if it was possible to have a lawyer present, and Captain Watts told him that if he wanted an attorney, that was his right. Defendant said he would rather have "one," i.e., an attorney.

At the suppression hearing, Captain Watts testified that at this point, he stopped questioning Defendant and "was turned around and started doing the paperwork." Captain Watts did not leave the room. This court's review of the video showed that when Defendant said he would rather have an attorney, Captain Watts asked, "[w]hy," and Defendant said he knew a lot of cops in Vidalia were "crooked." Captain Watts then explained to Defendant that there were cameras in the room, and everything was being recorded. Captain Watts then said, "So you don't want to talk about Tyberia being dead," and Defendant said, "We can." Captain Watts reminded Defendant he had asked for an attorney, so he asked, "Which is it?" Defendant responded, "We can talk about it." Captain Watts asked Defendant to sign the waiver form, and as Defendant approached the desk to do so, Captain Watts verbally clarified that Defendant did not want an attorney or to have one present during questioning. Although Defendant's verbal response was not clear on the video, he signed the waiver form. Captain Watts testified at the suppression hearing that Defendant mumbled "Huh-uh" as he signed the form. Captain Watts also testified that the interview did not stop because Defendant clearly withdrew his request for counsel at this point. Defendant then proceeded to talk with Captain Watts.

The trial judge denied the motion to suppress, stating, "I think this is a situation where he indicated he wanted a lawyer, but when the officer started

gathering all his things together, then he did make a voluntary statement. So, I'm going to deny your Motion to Suppress."[2]

In *State v. Guidry*, 19-200, pp. 3–4 (La.App. 3 Cir. 6/19/19), 274 So.3d 919, 921, this court discussed the standard of review to be applied for a ruling on a motion to suppress:

> In *State v. Wells*, 08-2262, pp. 4-5 (La. 7/6/10), 45 So.3d 577, 580-81 (alteration in original), the supreme court reiterated the appellate standard of review applicable to rulings on motions to suppress:
>
>> This court has recently restated the general rule that appellate courts review trial court rulings under a deferential standard with regard to factual and other trial determinations, while legal findings are subject to a *de novo* standard of review. *State v. Hunt*, 09-1589, p. 6 (La. 12/1/09), 25 So.3d 746, 751, *citing State v. Hampton*, 98-0331, p. 18 (La. 4/23/99), 750 So.2d 867, 884. When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings. *Id*. A "trial judge's ruling [on a fact question], based on conclusions of credibility and weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling." *State v. Bourque*, 622 So.2d 198, 222 (La. 1993).
>
> That is similar to what happened in this case. Defendant never raised the claim to the trial court in a motion to suppress that the letter should have been suppressed because he asserted his right to counsel when approached by police on Sept. 10 or the police misled him to thinking he did not have a lawyer. Although the burden of proof was on the State on the trial of the motion to prove its admissibility, the defendant must raise all grounds for suppression of the evidence that are knowable or available at that time. The defendant bears this burden in order to give the State adequate notice so that it may present evidence and address the issue at trial on the motion. Because Montejo did not raise these grounds in a motion to suppress or allege facts supporting those grounds, the State had no need to put on evidence tending to show that defendant never made a clear assertion of his right to counsel or

---

[2]Defense counsel gave notice of his intent to file a writ application with this court, and a writ application was subsequently filed, but it was denied as untimely. *State v. Mason*, 23-606 (La.App. 3 Cir. 10/18/23) (writ ruling).

that the police never misled him. It simply put on evidence at the motion hearing as required by La.C.Cr.P. art. 703(D) and La. R.S. 15:451 that the letter was admissible, and put on evidence at trial as required by La.C.Cr.P. art. 703(G) concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. Thus, the officers only testified at the suppression hearing and at trial that basically they asked if he had a lawyer, he said no, and then they read him his rights. It was not until the defendant testified at trial that he told the police he thought he had a lawyer and they told him he did not, that this potential *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880 (1981),] violation and waiver issue was ever even alluded to. The State had no need, and was not required, to rebut this testimony because the evidence had already been admitted and it had never been claimed that the letter was obtained illegally on those grounds. *See State v. Joseph,* 434 So.2d 1057, 1061, n. 3 (La.1983) (where defendant testified at trial that confession was beaten out of him and court had already ruled the statement was admissible in motion to suppress, because that ruling was binding at trial under La.C.Cr.P. art. 703, the state was not obligated to present rebuttal evidence to "rehabilitate" the confession).

An assertion of the right to counsel must be "clear and unequivocal." *State v. Payne*, 01-3196, p. 13 (La. 12/4/02), 833 So.2d 927, 937.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the Fifth Amendment gives a suspect subject to custodial interrogation the right to consult with an attorney during questioning. *State v. Payne*, 01-3196 (La. 12/4/02), 833 So.2d 927, 934; *Miranda v. Arizona*, 384 U.S. at 469–473, 86 S.Ct. at 1625–1627. The police are required to explain this right to the suspect before the custodial interrogation, "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," begins. *State v. Payne, supra* at 934, *citing Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), *quoting Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1619. The safeguards regarding the *Miranda* right to counsel are triggered by both a custodial setting and official interrogation. *State v. Payne, supra* at 934.

After a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning a suspect unless or until he clearly requests an attorney. *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994). Whether the accused actually invoked his right to counsel is an objective inquiry. *State v. Payne*, 833 So.2d at 935, citing *Davis v. United States*, 512 U.S. at 458–459, 114 S.Ct. at 2355. In order to invoke his right to counsel, the suspect must articulate his desire to have counsel present with

sufficient clarity to enable a reasonable police officer, in the circumstances, to understand his statement to be a request for an attorney. *Id. See also*, *State v. Leger*, 05-0011 (La. 7/10/06), 936 So.2d 108, 135. The invocation of the right to counsel during the custodial interrogation "requires, at minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *State v. Payne*, 833 So.2d at 935, *quoting Davis v. United States*, 512 U.S. at 459, 114 S.Ct. at 2355.

Once a suspect has asked to have an attorney present, he is not subject to any further interrogation by the authorities until counsel has been made available to him, unless the suspect initiates further communication, exchanges or conversations with the police. *State v. Payne*, 833 So.2d at 935, citing *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). A cessation of questioning is not required, if the suspect makes a reference to an attorney that is ambiguous or equivocal, which causes a reasonable police officer, in light of the circumstances, to understand only that the suspect *might* be invoking the right to counsel. *State v. Payne*, *supra* at 935, *citing Davis v. United States*, 512 U.S. at 458, 114 S.Ct. at 2355. (emphasis in original).

In analyzing whether there has been a direct, clear, unequivocal, and unambiguous request for counsel, courts must give a broad, rather than narrow, interpretation to the suspect's request. *State v. Payne*, 833 So.2d at 936, *citing Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The admissibility of a confession or statement is a determination for the trial court and the trial court's ruling will not be overturned unless the preponderance of the evidence clearly favors suppression. *State v. Gant*, 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1123.

*State v. Allen*, 06-778, pp. 4–6 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 747–48

(footnote omitted), *writ denied*, 08-2432 (La. 1/30/09), 999 So.2d 754; *Guidry*, 1274

So.3d 919; *State v. Broussard*, 16-974 (La.App. 3 Cir. 6/13/17), 224 So.3d 23.

This court in *Broussard*, 224 So.3d at 34–35 (alterations in original), further

explained:

The case referred to above by the trial court was *Davis*, 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362, wherein the defendant, during interrogation, stated that "[m]aybe I should talk to a lawyer." The United States Supreme Court did not find that the statement was an unequivocal and unambiguous statement such that would require the interrogating officers to terminate the interview. Similarly, in *Allen*, 955 So.2d 742, after the defendant was advised he had the right to

21

counsel during interrogation, he told the officers that he might want to speak with an attorney but wanted to think about it. He was given a cigarette and a drink and left alone to ponder. When asked if he was ready to give a statement, the defendant stated he was. Again he was *Mirandized* before he confessed to the offense. The officer then asked him to make a recorded statement. Once again, the defendant said he needed to think about it and asked for food. He was given lunch, another cigarette break, and then he confessed on tape. After he was charged, the defendant filed a motion to suppress his statements claiming that he had twice asked for counsel but was ignored. The fifth circuit found that the trial court did not err when it denied the defendant's motion to suppress the statements. Citing a case from this court, the fifth circuit stated:

> Additionally, in *State v. Chesson*, 03-606 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 173–175, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686, the Third Circuit upheld the trial court's denial of the defendant's motion to suppress his statement despite his statement to police officers while being transported that "he might—he felt like he should talk to an attorney." The Third Circuit concluded that "[t]he defendant's statement regarding his 'thinking' that he possibly 'should' speak with an attorney is not the type of unequivocal and unambiguous statement described above [in *Davis*]."

> Similar to *State v. Chesson*, *supra*, the defendant in the present case twice stated he was "thinking" he "might" want an attorney. According to Detective Becnel, who the trial court found credible, the defendant never unequivocally stated he wanted an attorney. Under *Davis*, the defendant's statements that he thought he might want to speak to an attorney were ambiguous and cessation of questioning was not required.

*Id.* at 749–50 (footnote omitted).

Finally, in *State v. Leger*, 05–11, pp. 31–32 (La. 7/10/06), 936 So.2d 108, 135, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007), the supreme court did not find that the statement, "I know I need to see one [a lawyer]" amounted "to an unambiguous request for counsel that would indicate to a reasonable police officer that the defendant was asking for counsel at that time."

Considering, as noted above in *Allen*, 955 So.2d at 748 (citing *Payne*, 833 So.2d at 936, and *Jackson*, 475 U.S. 625, 106 S.Ct. 1404 (1986)) that the "courts must give a broad, rather than narrow, interpretation to the suspects request[,]" we cannot say that the trial court erred in the current case when it found that the defendant's

statement that he thought he wanted a lawyer was an unequivocal indication such that required the detectives to terminate the interview. The trial court did not err when it denied the defendant's motion to suppress his videotaped statements.

We find Defendant's statement that he would rather have an attorney was sufficient to invoke his right to counsel; thus, this court must consider whether what followed constituted initiation of further communication by Defendant.

In *State v. Reeves*, 96-1186, pp. 4–8 (La.App. 3 Cir. 6/4/97), 696 So.2d 226, 229–31 (fourth alteration in original), this court discussed what constitutes interrogation and the initiation of further communication:

> To protect the privilege against self-incrimination, the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Once an accused has expressed his desire to deal with law enforcement officials only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).

> "When an accused invokes his *Miranda* right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances." *State v. Koon,* 96–1208, p. 7 (La.5/20/97); [704] So.2d [756], [762–63] [1997 WL 261370]. With guidance from *Koon,* we frame the issue in this case as follows: did the detectives continue to interrogate defendant such that his further statements cannot be deemed an initiation of further conversation "because the interrogation never ended." *Id.* at p. 8; [704] So.2d at [763].

> In *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), the Court extended the *Miranda* safeguards to the "functional equivalent" of interrogation, which the Court defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

Nonetheless, the Court in *Innis* concluded that the police did not "interrogate" the defendant. In *Innis,* two police officers commented about their concern that handicapped children might injure themselves if, by chance, they found a missing murder weapon. This musing between the officers prompted the defendant, who had previously requested counsel, to reveal the location of the weapon. The Court found this conduct was not the "functional equivalent" of interrogation because the officers' "off-hand remarks" were not express questions directed to the defendant and the officers had no reason to suspect that the defendant was susceptible to an appeal concerning the safety of handicapped children.

Since deciding *Innis,* the Court has rarely visited the question of what conduct amounts to "interrogation." *See Lewis v. Florida,* 486 U.S. 1036, 108 S.Ct. 2025, 100 L.Ed.2d 612 (1988) (Mr. Justice White dissenting from denial of *certiorari*). However, *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1937, 95 L.Ed.2d 458 (1987), offers the following guidance: "In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards:* preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."

In *Mauro,* the Court again found no *Miranda* violation. The court held that the police's conduct in allowing the defendant to speak with his wife, and openly taping the conversation, did not amount to interrogation because the defendant was not subjected to "compelling influences, psychological ploys, or direct questioning." *Id.* at 529, 107 S.Ct. at 1937.

Consistent with *Mauro,* the United States Court of Appeals for the Fifth Circuit has "rejected an interpretation of *Edwards'* prophylactic rule that is *divorced from the context of badgering police conduct* from which that rule sprang." *Plazinich v. Lynaugh,* 843 F.2d 836, 838–39 (5th Cir.1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989) (emphasis added). In that case, the defendant first requested counsel but then confessed to murder shortly after the police informed him that his accomplice/girlfriend had attempted suicide because she feared that she alone would be blamed for the crime. The court found no violation, noting that the remark was not inquisitorial and that the officer had no reason to expect an immediate response. "It is difficult to conceive, however, that one informational comment made to a defendant can be so 'overreaching' as to violate the spirit of *Edwards.*" *Id.* at 839.

The "overreaching" in *Edwards,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, occurred when the police visited the defendant in jail and insisted he "had to" talk to them, even though he had previously requested an attorney and he did not want to discuss his case at that

time. In *State v. Abadie,* 612 So.2d 1 (La.1993), *cert. denied,* 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993), the Supreme Court of Louisiana found a similar violation, where police repeatedly requested that the defendant submit to a polygraph examination after he had made several unsuccessful attempts to obtain counsel. More recently, in *Koon,* [704] So.2d [756], the court found error where the police repeatedly questioned the defendant about his *Miranda* rights to "keep him talking." *Id.* at p. 9, [704] So.2d [at 763]. *See also State v. Lee,* 524 So.2d 1176, 1182 (La.1987), the police confronted the defendant with a picture of the victim and asked him "why would he shoot this young boy." The court found the police's conduct clearly amounted to interrogation because the remarks were not "off-hand," but directly linked to the crime, and the defendant was subject to express questioning.

For the following reasons, we do not find similar overreaching in this case. The record clearly supports the trial court's finding that the detectives ceased questioning defendant when he requested counsel. When defendant began speaking again, Detective Hughes reminded him that she could no longer discuss the case with him. Her comment that this was the "last opportunity" that defendant would have to "tell us" his story does not imply, as in *Edwards,* that defendant "had to" talk or that defendant would not be permitted to speak with someone else.

Nor can we find error in Detective Hughes' giving defendant a copy of the warrant for his arrest and the supporting affidavit. Detective Hughes testified that she gave defendant these documents to inform him that he was being charged with first degree murder and that she did not know the affidavit was attached to the warrant. Detective Hughes had no way of knowing that defendant would blurt out "I didn't shoot anybody in the back of the head," when the evidence gathered irrefutably established that the victim died from a gunshot wound to the back of the head.

In *United States v. Payne,* 954 F.2d 199 (4th Cir.1992), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992), the defendant made incriminating statements in response to an agent's description of certain inculpatory evidence. The court observed, "Although the supreme court has not directly addressed this question, there are indications that mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for *Miranda* purposes." *Id.* at 202. Rather than characterizing this conduct as "overreaching," the court opined that information about the evidence against a suspect may "contribute to the intelligent exercise of his judgment regarding what course of conduct to follow." *Id. See also Enoch v. Gramley,* 70 F.3d 1490, 1500 (7th Cir.1995), *cert. denied,* [519] U.S. [829], 117 S.Ct. 95, 136 L.Ed.2d 50 (1996), where the court stated, "Briefly reciting to a suspect in custody the basis for holding

him, without more, cannot be the functional equivalent of interrogation."

Detective Hughes' conduct in handing defendant the warrant and affidavit served only to inform defendant of the crime for which he was charged and gave defendant a brief description of the evidence against him. Under the above jurisprudence, this conduct cannot be considered "interrogation." Neither Detective Hughes nor Detective DeLouche engaged in "police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind." *Koon,* p. 7; 704 So.2d at [762].

Defendant had twice been advised of his rights. Unlike the officers in *Koon,* Detectives DeLouche and Hughes stopped all questioning when defendant requested an attorney. After defendant said, "I want to tell y'all what happened," Detective Hughes reminded him that she could no longer discuss the case with him because he asked for a lawyer. Defendant's outburst was prompted by a written description of the victim's fatal wound. The detectives could not have foreseen that this information—which they knew to be accurate—would prompt defendant to exclaim that the victim had not been shot in the back of the head. For these reasons, we agree with the trial court that defendant's confession and subsequent statements were made freely and voluntarily after a knowing and intelligent waiver of his rights.

The Louisiana Supreme Court disagreed with this court's opinion, in part:

Granted in part; denied in part. Although "mere declaratory descriptions of incriminating evidence do not *invariably* constitute interrogation for *Miranda* purposes," *United States v. Payne,* 954 F.2d 199, 202 (4th Cir.1992) (emphasis added), and no fixed rule exists that "all such statements are objectively likely to result in incriminating responses by those in custody," *id.,* 954 F.2d at 203, "whether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue." *Id.* In this case, when police responded to the defendant's request for an attorney during the November 4, 1994 stationhouse interrogation by handing the defendant the arrest report, arrest warrant, and the warrant's supporting affidavit listing the evidence, and giving him misleading advice that this moment represented his "only chance" to tell them his side of the story, the officers went beyond simply informing the defendant of the basis for "why he was being held." *Enoch v. Gramley,* 70 F.3d 1490, 1500 (7th Cir.1995), *cert. denied,* [519] U.S. [829], 117 S.Ct. 95, 136 L.Ed.2d 50 (1996). By suggesting that the defendant had only this one opportunity to respond to the evidence arrayed against him, the officers pressured him to continue speaking with them, thereby foregoing his previously invoked right to have counsel present. *Edwards v. Arizona,* 451 U.S.

477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In combination, the officers' actions and words were reasonably likely to elicit an incriminating response and amounted to the functional equivalent of interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Koon,* 96–1208 (La.5/20/97), 704 So.2d 756, *cert. denied,* [522] U.S. [1001], 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); *State v. Abadie,* 612 So.2d 1, 6 (La.1993), *cert. denied,* 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35. 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). Interrogation by deputies then continued at the jail. *See United States v. Webb,* 755 F.2d 382 (5th Cir.1985).

The trial court therefore erred in admitting the defendant's November 4, 1994 statements. The case is remanded to the court of appeal to determine whether admission of the *Edwards*-defective statements was harmless. *See Koon,* 96–1208 at 9–14, 704 So.2d at 763–766; *State v. Corley,* 633 So.2d 151 (La.1994); *State v. Lee,* 524 So.2d 1176, 1191 (La.1987). In all other respects, the application is denied.

*State v. Reeves*, 97-1806, pp. 1–2 (La. 6/26/98), 714 So.2d 696, 696–97.

On remand, considering the other evidence presented at trial, this court found that the admission of the videotaped confessions and other statements taken in violation of the defendant's right to counsel were harmless beyond a reasonable doubt. *State v. Reeves*, 96-1186 (La.App. 3 Cir. 8/5/98), 715 So.2d 1291, *writ denied,* 98-2381 (La. 1/8/99), 734 So.2d 1227. The test for determining harmless error is "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993).

As stated above, we find Defendant initially invoked his right to counsel. Captain Watts asking "why," and continuing with "so you don't want to talk about Tyberia being dead" was an attempt to clarify Defendant's request for counsel rather than being further interrogation. Beyond that point, Captain Watts reminded Defendant he had requested counsel and asked Defendant to choose between having an attorney or continuing to talk to authorities. Defendant said he wished to talk,

and he then signed a waiver form after being advised of his rights. Like the defendant in *State v.* Koon, 96-1208 (La. 5/20/97), 704 So.2d 756, the interrogation of Defendant had ended. It was Defendant who initiated the conversation with Captain Watts. While signing the form, Captain Watts even verbally clarified that Defendant did not want an attorney or to have one with him during questioning, and Defendant signed the waiver form. We find this is sufficient to constitute a valid waiver of his right to counsel.

## CONCLUSION

We affirm Defendant's conviction and sentence. Defendant is advised that in accordance with La.Code Crim.P. art. 930.8, no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.Code Crim.P. arts. 914 or 922.

**CONVICTION AND SENTENCE AFFIRMED.**